## CHARLES MILTON WANTLAND v. STATE OF MARYLAND

[No. 1126 (On Remand), September Term, 1979.]

*Decided October 7, 1981.*

The cause was argued before GILBERT, C. J., and MORTON and THOMPSON, JJ.

*George E. Burns, Jr., Assistant Public Defender,* with whom were *Alan H. Murrell, Public Defender,* and *Michael R. Malloy, Assistant Public Defender,* on the brief, for appellant.

*Deborah K. Handel, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Joseph C. Sauerwein, Deputy State's Attorney for Prince George's County,* on the brief, for appellee.

GILBERT, C. J., delivered the opinion of the Court.

This case is revisited because the Supreme Court of the United States, in *Wantland v. Maryland,* No. 80-5640,

vacated our judgment in *Wantland v. State,* 45 Md. App. 527, 413 A.2d 1376 (1980) and remanded the matter to us for reconsideration in the light of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

At Wantland's request, we allowed new briefs to be submitted and reset the case for oral argument.

The thrust of Wantland's argument on reconsideration is, as might be expected, that his oral statements to the police should have been suppressed, citing *Edwards v. Arizona, supra.*

We perceive no reason to repeat the sordid facts of the case. Instead, we shall quote only those facts that are pertinent to the "statements" given by Wantland to the police.

"I.

—THE PRE-TRIAL STATEMENTS—

During the course of the investigation into young Henley's death, Corporal David R. Hatfield was assigned to 'find anybody [in the area concerned] that could ... [furnish] either [a] positive or negative response ... [as to the identity of] a possible suspect. . . .' Wantland, described in the transcript as 'the caretaker or occupant of the Berger Mansion' was one of the persons that Hatfield was to interview with respect to the identity of the suspect.

At approximately 10:30 p.m. on Sunday, June 18, 1978, Hatfield and another police officer went to the Berger Mansion where they found Wantland. The officers requested that Wantland accompany them to the Bureau of Criminal Investigation (B.C.I.). The avowed purpose for requesting Wantland to accompany them was to learn what Wantland knew about the crime. Wantland went with the officers. When the trio arrived at the B.C.I. facility, Wantland was taken to an 'Interview Room' at

sometime shortly after 11 p.m. No restraints were placed upon him, and he was *not* [(emphasis in original)] given the *Miranda* [1] warnings. Hatfield, during the next five hours, succeeded in getting Wantland to make a six page statement. The statement was suppressed by the circuit judge on Wantland's motion.

Hatfield left the Interview Room at the conclusion of the interview, around 3:30 a.m., June 19, 1978. Corporal T.R. Tucker entered about one-half hour thereafter. Tucker informed Wantland that he, Wantland, was under arrest for the murder of Donnie Henley. Tucker related to the court that he 'read . . . [Wantland] a waiver of rights form' and recorded Wantland's answers to the questions printed thereon. Wantland was then handed the form to read and sign.

The printed form declared that Wantland understood the *Miranda* warnings. With respect to the question of whether Wantland was willing to make a statement without the presence of an attorney, Wantland responded, 'No.'

*Notwithstanding Wantland's express negative reply to the Miranda litany, Tucker recounted, Wantland continued to talk. The officer questioned Wantland in order to determine whether Wantland was willing to make a statement even though counsel was not present. According to Tucker, Wantland answered that he wanted to talk.*

Prior to any conversation regarding the offenses forming the gravamen of this appeal, Wantland was permitted to use the toilet facilities, as well as to purchase some cigarettes. Upon returning to the Interview Room, Wantland explained to the officer the reason for the negative response to the question on the waiver of rights form relative to counsel. He

---

**1.** Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

related that at the time of a prior arrest, 'he made a statement to the police and it was in error and it was admitted at the time of trial. . . .' Wantland made clear that his objection was to making a *written* [(emphasis in original)] statement. Wantland apparently was of the belief that in order to be admissible as evidence a statement had to be in writing. Tucker did nothing to alter or correct Wantland's misbelief, but, instead, acting on the appellant's desire to 'talk,' began his interrogation. The trial court denied Wantland's attempt to suppress that statement.

The third oral statement was taken the following afternoon by Corporal M.K. Morrissette. Morrissette told the court that he was assigned to take Wantland to the Prince George's County Hospital so that a physician could take samples of the appellant's saliva and blood. While at the hospital, Wantland complained to Morrissette that no one would listen to appellant. Morrissette suggested that he would take a statement following the medical procedure.

At the completion of the sampling, Wantland was transported back to B.C.I. by Morrissette. There, prior to any questioning, Wantland was again advised of his *Miranda* rights. Appellant responded that he was willing to make a statement to the officer without benefit of counsel. It was clear from subsequent remarks that Wantland made the oral statement under the misconception that it could not be used against him. The circuit judge, over objection, admitted the statement into evidence.

The fourth and final statement was made by appellant to Corporal Rowzie, the coordinator of the investigation. Rowzie told Judge Levin that on July 5, 1978, he went to Prince George's County Detention Center in order to speak to Wantland. Before there was any contact between Rowzie and the appellant, an unidentified correctional officer

explained to Wantland that he was entitled to have his attorney present during any interview with the police officer. A form entitled 'Detainee Waiver,' the text of which purported to be a waiver of that right, was presented to Wantland, who signed the form.

Rowzie recounted that he then advised the appellant of the full panoply of *Miranda.* Wantland was asked if he understood those rights, and he replied in the affirmative. According to the officer, the appellant then stated that he already had an attorney, but that he did not desire the attorney's presence during the interview. That, of course, is precisely what he waived when he signed the form presented to him by the guard. Rowzie questioned the appellant and took an oral statement which was admitted, over objection, at trial." (Footnotes omitted.) (Emphasis supplied.)

Justice White, for the Court, said in *Edwards:*

"[A]lthough we have held that after initially being advised of his *Miranda* rights, the accused may himself validly waive his rights and respond to interrogation, *see North Carolina v. Butler,* . . . [441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979)], the Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. *We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police."*

(Footnote omitted.) (Emphasis supplied.) 451 U.S. at 484-85, 101 S.Ct. at 1884-85, 68 L.Ed.2d at 386.

Shortly after *Edwards* was decided, we had the occasion to apply it in *Bryant v. State,* 49 Md. App. 272, 431 A.2d 714 (1981). There we said:

> "*Edwards* does not, in our view, expand upon *Miranda's* breadth but, rather, serves to underscore that when an accused, arrestee, or suspect, at any custodial questioning, demands his right to have counsel present, *all* [(emphasis in original)] interrogation must at that point cease until counsel for the accused, arrestee, or suspect is present. Once the right to the presence of counsel has been invoked, the authorities may not thereafter, directly or indirectly, initiate another attempt at interrogation until and unless counsel for the accused, arrestee, or suspect is present.
>
> *Edwards makes perspicuous that notwithstanding the prior invocation of the Miranda tenet of the right to the presence of counsel, the accused, arrestee, or suspect may validly waive that right provided the accused, arrestee, or suspect, himself, initiates 'further communication, exchanges or conversations with the police.'* . . . *See also North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). The burden of showing a waiver of *Miranda* rights rests on the prosecution. '[A] valid waiver of . . . [the right to counsel] cannot be established by showing only that . . . [the accused, arrestee, or suspect] responded to further police-initiated custodial interrogation even if he has been advised of his rights.' (Footnote omitted.) *Edwards v. Arizona, supra.*" (Emphasis supplied.)

We think it clear that Wantland invoked his right to counsel. At that point interrogation was halted. Nevertheless,

Wantland continued to talk. The transcript of the testimony of Corporal T.R. Tucker of the Prince George's County Police Department, given at the suppression hearing, is, in pertinent part, as follows:

"[By Corporal Tucker:]

A. I entered Interview Room Number 1, Bureau of Criminal Investigations, with my partner Corporal Morrissette. I told Mr. Wantland he was under arrest, was going to be charged with murder of the Henley boy. This was shortly after 4:00 a.m.

Mr. Wantland began to talk to me. I told him to stop, I wanted to hear what he had to say but I wanted to advise him of his rights.

I sat at a table adjacent to Mr. Wantland and I read him a waiver of rights form. I filled in his answers to the appropriate questions. I then gave the form to Mr. Wantland, asked him to read it to himself and to sign it. He did so. After he signed it Corporal Morrissette signed the form and I signed the form, and then Corporal Morrissette took the form and left the room.

(A waiver of rights form was marked State's Exhibit No. 9 for identification.)

BY MR. SAUERWEIN [Assistant State's Attorney]:

Q. I show you what is marked as State's Exhibit No. 9, and I will ask you if you can identify that?

A. This is the form. It has my signature, Corporal Morrissette's and Mr. Wantland's signature, which I observed him make, along with the date and time he placed on the form.

Q. You indicated that you read that to Mr. Wantland, did you not, sir?

A. Yes, sir.

Q. Will you tell the Court, for the record, exactly what Mr. Wantland was read by you?

A. 'Waiver of rights form.[']

'I, Corporal T. R. Tucker, have identified myself to you as a police officer of the Prince George's County Police Department. Before asking you any questions, I am advising you that you have certain rights.[']

. . . .

'You are further advised that (1) You have a right to remain silent (2) Anything you say can and will be used against you in a court of law (3) You have a right to talk to a lawyer and to have him with you during questioning, (4) If you cannot afford a lawyer, one will be appointed for you before a statement is taken if you wish (5) If you decide to give a statement you still have the right to stop at any time so you may talk to a lawyer. Do you understand your rights and what I have just explained to you?'

He answered, 'Yes.' And I wrote in the 'Yes'.

'Are you willing to make a statement without a lawyer at this time?'

He replied, 'No.' And I wrote in 'No'.

'Do you understand and know what you are doing?'

He answered, 'Yes.'

I wrote in 'Yes.'

'Have any promises, threats or inducements been made to pressure or coerce you into making this statement?'

He replied, 'No.'

I then gave him the form, asked him to read it. He asked no questions of the form. He signed it, dated it and wrote the time. Corporal Morrissette then signed the form and I signed it.

Q. Where did this physically take place now?

A. Interview Room Number 1, Bureau of Criminal Investigations, Forestville.

Q. When you first was [*sic*] Mr. Wantland was he restrained in any manner?

A. He was never restrained at any time.

Q. By you?

A. In my presence or to my knowledge.

Q. And did Mr. Wantland ask any questions of you in reference to what you advised him?

A. No.

Q. Did he request a lawyer?

A. No.

MR. SAUERWEIN: Excuse me a moment, your Honor. The Court's indulgence.

I move for the admission, your Honor, of State's Exhibit No. 9.

MR. NILAND: No objection for the purposes of this hearing.

THE COURT: Nine is admitted.

(State's Exhibit No. 9 for identification was received in evidence.)

BY MR. SAUERWEIN:

Q. What, if anything, did Mr. Wantland do at the completion of those advisements to him, Corporal Tucker?

A. Mr. Wantland had been talking to me ever since I came into the room. I stopped him and told him before I talked to him I wanted to advise him of his rights, but I did want to hear what he said. At the conclusion of the waiver Corporal Morrissette took the waiver and left the room. Mr. Wantland continued to talk to me, and I stopped him and I said, 'You talked to me before, you are talking to me now. You indicated on the form you would not talk to me without a lawyer present. Do you want to talk to me without a lawyer present or not?[']

He said that was not what he meant, meant that

he would not write a statement, nor would he sign anything, but he would talk to me.

I said, 'If you want I will leave the room and I won't talk to you at all.'

He said, 'No, I want to talk to you.'

And I specifically asked him if he would talk to me and make a statement without a lawyer present. And he said, 'Yes.'

Q. And did anything transpire after this verbal exchange?

A. Yes. I still hadn't spoken with him about the offense. He asked me if he could go to the bathroom. I took him out of the room and he went to the bathroom in the lobby of our office.

We went back in the room. He asked me if I could get him some cigarettes. He had change to purchase the cigarettes. I asked him what type. He said he wanted Pall Mall cigarettes.

I went back out in the lobby and purchased him a pack of cigarettes, and I brought them back into the room.

Q. At the time that he was taken to the bathroom was he escorted to that room by you?

A. Yes.

Q. At this period of time did Mr. Wantland show any confusion about anything that you were saying to him?

A. No. He seemed to understand very well what was happening.

Q. Did he have any questions of you following your return with him from the bathroom?

A. Yes. After I brought him cigarettes we were back in the room and he asked me what was going to happen to him. I asked him if he understood he was going to be charged with murder and he was under arrest. He said, 'Yes.'

I told him he would be taken from there, being the office we were in, before a judicial officer and he would be jailed that night; that a judicial officer could not set a bond on him for that offense, and he would be taken before a judge the next day for a bond hearing, at which time a bond release would be determined.

Q. Did he have any further questions at that point?

A. No, he didn't.

Q. Did you make any promise to him in reference to bond or any other matter in order to induce him to give you a statement?

A. No. I specifically told him he was going to jail and there would be no bond.

Q. Did you in any manner or did anyone in your presence threaten him in any way with any form of sentence or any form of a threat?

A. No.

Q. Did you use any force on him in order to induce him to make a statement?

A. No.

Q. Did you attempt to persuade him in any manner to make a statement to you?

A. I did not.

Q. Was there any time that he indicated to you that as to what has happened up to now he was reluctant to do anything?

A. No.

Q. Did he make any request of you whatsoever outside of wanting to go to the bathroom?

A. He asked me for coffee, and I got him coffee.

Q. And you indicated that you got him cigarettes?

A. Yes, I did.

Q. And did he proceed to give you a statement?

A. Yes. He continued to talk to me in general conversation not relevant to the case. And I said, 'I want you to tell me about the case, and I want to know what you [*sic*] side of it is. Any number of things could have happened between you and the Henley boy. I don't know what they could have been, and I want you to tell me about it. He said he could not remember.

. . . .

Q. Without going into the substance of any statements that he made to you at this particular time, Corporal Tucker, at any time prior to him making a statement or statements to you, at any time during the course of making a statement to you, did he ever request a lawyer?

A. No, he didn't.

Q. Did he indicate by way of clarification any further as to what he meant by the fact that he didn't want to make a statement to you without a lawyer present?

A. Yes. He said when he was arrested for murder before he made a statement to the police and it was in error and it was admitted at the time of the trial, and he didn't want to do that again.

Q. So, he indicated to you that his request was directed to not making a statement in writing?

A. That is right. He said he wouldn't write anything and he wouldn't sign anything.

Q. And did you ask him to write anything or sign anything?

A. No, I didn't.

Q. Did he during the course of this statement — how long was it, would you say, Corporal Tucker, that this statement that he gave you took?

A. Just the statement 20 minutes approximately.

Q. All right. And at the conclusion of this

statement by him to you what, if anything, did you do?

A. At the conclusion of the statement I left the room."

In our view, the transcript clearly shows that Wantland, after invoking *Miranda,* then proceeded to waive its protection by initiating "further communication, exchanges or conversation with the police." *Edwards v. Arizona, supra.* Thus, Wantland has removed himself from the protective cover of *Miranda.* He has done precisely that which the Supreme Court, in *Edwards,* said he must do in order to waive validly the protection of *Miranda. See also Bryant v. State, supra.*

Wantland removed himself voluntarily from the *Miranda-Edwards* protective garb. After he did so, he inculpated himself. We see no reason why he should now be allowed to again don the armor of *Miranda-Edwards* and shield himself from what he did during the time he laid the buckler aside.

We hold that Wantland validly waived his *Miranda-Edwards* rights when, after invoking *Miranda,* he initiated further conversation with Corporal Tucker. We further hold that Corporal Tucker's testimony was sufficient to show that Wantland, not the police, initiated the post-*Miranda* conversation. *Edwards v. Arizona, supra; Bryant v. State, supra.*

Having re-examined the instant case in the light of *Edwards v. Arizona* and applying the principles of *Miranda* and *Edwards* thereto, we reaffirm our prior holding.

*Judgments affirmed.*
*Costs to be paid by appellant.*