503 A.2d 1333

**Larry Leroy HENLEY et al.**

**v.**

**PRINCE GEORGE'S COUNTY, Maryland et al.**

**No. 134, Sept. Term, 1984.**

Court of Appeals of Maryland.

Feb. 7, 1986.

John J. Pyne (William P. Dale, on brief), Washington, D.C., for appellant.

Leonard L. Lipshultz (Victor I. Weiner and Lipshultz & Hone, Chartered on the brief of Silver Spring, and Don F. Ryder, Jr., Schroeder, Ryder & Braden, on brief), Rockville, for appellee John H. Jones Trading as Capital Building and Remodeling Co.

Sherrie L. Krauser, Associate Co. Atty. (Daniel I. Sherry and Thomas P. Smith, Co. Atty., Michael O. Connaughton, Deputy Co. Atty., on brief), Upper Marlboro, for appellees Prince George's County, Md. and Bd. of Trustees of Prince George's Community College.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

McAULIFFE, Judge.

On Saturday, June 17, 1978, Charles Wantland sexually assaulted and murdered Donald Alan Henley, age 12. Wrongful death and survival claims were filed by the personal representative of Donald's estate and by his parents in an action against Wantland, John H. Jones T/A Capitol Building and Remodeling Company (Jones), Prince George's County, Maryland (the "County"), and the Board of Trustees of Prince George's Community College (the "College"). A default judgment was entered against Wantland, but all other claims were terminated in favor of the remaining defendants by summary judgment, and that action was affirmed by the Court of Special Appeals. *Henley v. Prince George's County*, 60 Md.App. 24, 479 A.2d 1375 (1984). We granted Appellants' petition for a writ of certiorari to consider important issues concerning claims of negligent hiring and retention, and of breach of the duty owed by an occupier of land.

I

*Facts*

In early 1978 the County embarked upon a skills training and improvement program in cooperation with the United States Department of Labor pursuant to the federal Comprehensive Employment and Training Act of 1973 (CETA). The purpose of the program was to provide specific construction skills training to 60 chronically unemployed persons, including but not limited to former convicts and convicts on work release status. The first phase of the program contemplated six months of classroom and practical training of all enrollees at a designated site, and the second phase contemplated supervised on-the-job training at various work sites. At the conclusion of this program the building contractor who had contracted with the County to provide the training was required to hire all enrollees (to a maximum of 50) who successfully completed the training cycle.

Because of irreconcilable differences, the County terminated its contract with the first building contractor selected, and on May 19, 1978, it entered into a contract with Jones for the management of the program. At the same time the County contracted with the College for the use and occupancy of property known as the Clinton Center (and formerly known as the Berger mansion) for use as a training site.

Wantland originally came into the program as a trainee, at which time he was on work release status at Patuxent Institution in Jessup. Wantland was serving a sentence of 30 years for second degree murder, and had a record of various other crimes, including repeated instances of drunken and disorderly conduct. Shortly after Jones took over the program, Wantland was hired as a carpentry instructor. The record shows that Jones was involved with a number of construction projects in the metropolitan area, and that managerial responsibility for the running of the project was entrusted to Milton Gordon, Project Director, and to Albert Ruffin, Assistant Director. Wantland was hired by Gordon, who at that time was aware of Wantland's extensive criminal background.

During the time he was enrolled as a trainee, and for a short time after he was employed as a carpentry instructor, Wantland continued to be an inmate of Patuxent Institution and was transported daily to and from the Clinton Center. Sometime prior to the murder Wantland was released from Patuxent, and arrangements were made for him to reside at the Clinton Center. At that time Ruffin was also residing at the Center, and was performing caretaker and security duties. Because of repeated acts of vandalism and theft that had occurred at the site after the inception of the program, an agreement was reached that Ruffin and Wantland would coordinate their activities so that one of them would be present on the property at all times.

There is a dispute as to whether Wantland was assigned any security duties in connection with his employment, and

we shall refer to additional facts relating to that issue in a later section of this opinion.

William Rawles, a trainee in the program, offered the following evidence by affidavit:

\*    \*    \*    \*    \*    \*

8. That vandalism, break-ins and burglaries had been occurring at the Clinton Center/Berger Mansion property and tools and equipment had begun to disappear.

9. That about a week or two weeks before I heard that Donald Henley was killed, I heard Albert Ruffin and Milton Gordon talking about these burglaries. I heard them talk about moving Wantland into the Mansion to be sure that someone was there at night to help prevent the thefts.

10. That on the Thursday or Friday prior to the murder of Donald Henley the following discussion took place between Charles M. Wantland and myself:

Wantland—"I think I know who is doing the breakins."

Me—"Then why don't you call the police?"

Wantland—"Fuck the damn police. I can take care of it myself. If I catch who's doing it I'm going to tie him to a tree and fuck him to death."

11. That I became concerned that Charles Wantland *did* intend to injure someone and that I therefore reported the conversation to the man in charge, Albert Ruffin, on that same Thursday or Friday. The following conversation took place:

Me—"Is that fellow Charlie alright? If it's one of these dudes doing the break-ins they'd better be careful. He's talking about tying him to a tree and fucking him to death."

Ruffin—"What the fuck are you worried about? Don't worry about it.

Wantland anally sodomized and stabbed Donald to death [1] in a wooded area of the Clinton Center property at about 6:00 p.m. on the following Saturday, one or two days after the alleged statements had been made. The Rawles affidavit was not available for consideration by the trial judge when he granted Appellees' motions for summary judgment. Appellants filed a timely motion to vacate the order granting summary judgment, accompanied by the Rawles affidavit and an explanation that they had not discovered the information contained in the affidavit until after the motions for summary judgment had been argued. Judge Rea declined to vacate the judgment, and entered an order pursuant to Maryland Rule 605 a (now Rule 2–602) certifying the judgment as final and immediately appealable.

## II

### *The Rawles Affidavit*

We initially consider the action of the trial court in refusing to set aside the order granting summary judgment and refusing to consider the affidavit of additional facts proffered by Appellants. The order granting summary judgment was entered on June 2, 1983, following a hearing on May 13. On July 1, Appellants filed a motion to set aside the order, arguing that the trial judge had improperly resolved factual disputes, and proffering new factual matter contained in the affidavit of Rawles. The College and the County filed a brief response, contending that Appellants offered no new facts or legal arguments. Jones did not file a response. On July 7, Judge Rea entered an order sustaining his previous order granting summary judgment, without further comment.

---

**1.** Wantland was convicted of murder in the first degree, first degree sexual offense, and carrying openly a deadly weapon with the intent to injure. *Wantland v. State,* 45 Md.App. 527, 413 A.2d 1376 (1980), *vacated and remanded,* 451 U.S. 1014, 101 S.Ct. 3001, 69 L.Ed.2d 386 (1981), *conviction aff'd,* 49 Md.App. 636, 435 A.2d 102 (1981), *cert. denied,* 457 U.S. 1121, 102 S.Ct. 2937, 73 L.Ed.2d 1335 (1982).

Because the order of June 2 did not dispose of the claim against Wantland, it was interlocutory and subject to revision in the discretion of the trial court. Maryland Rule 605 a (now Rule 2–602). *Tedrow v. Ford Motor Co.*, 260 Md. 142, 144–45, 271 A.2d 688 (1970); *Associated Realty Co. v. Kimmelman*, 19 Md.App. 368, 374, 311 A.2d 464 (1973). We shall assume for purposes of this case that the standard to be applied in deciding a motion to revise an interlocutory judgment is the same as that applied to resolve a motion to revise a final judgment filed in accordance with Rule 2–535(a). Judge Smith, writing for the Court, reviewed this standard in *J.B. Corporation v. Fowler*, 258 Md. 432, 434–36, 265 A.2d 876 (1970) and quoted the now familiar rule stated in *Clarke Baridon v. Union Co.*, 218 Md. 480, 483, 147 A.2d 221 (1958):

> After the judgment properly was entered, the question of whether it should or should not be vacated in whole or in part was within the sound discretion of the trial court for the ensuing thirty days. The decisive point no longer was whether there existed a genuine dispute as to a material fact, but rather whether the court was satisfied that there had been shown a reasonable indication of a meritorious defense or other equitable circumstances that would justify striking the judgment—that is, whether the court entertained a reasonable doubt that justice had not been done. *Phelps v. Herro*, [215 Md. 223, 137 A.2d 159 (1957) ]; 2 Poe, *Pleading and Practice* (5th Ed.), Sec. 392; *Smith v. Lapidus*, 208 Md. 273, 279 [118 A.2d 373].

In *Eshelman Motors v. Scheftel*, 231 Md. 300, 301, 189 A.2d 818 (1963), we said of the discretion reposed in the trial court that "it is a discretion which must be exercised liberally, lest technicality triumph over justice." We have also said that this discretion will not be disturbed unless clearly shown to have been abused, and that this is particularly true where judgment has been entered on the merits rather than as a result of a default. *Hardy v. Metts*, 282 Md. 1, 6, 381 A.2d 683 (1978).

Applying the standards we have discussed to the facts of this case, we hold that the trial judge abused his discretion in refusing to set aside the earlier order and refusing to reconsider the motion for summary judgment in light of the additional facts presented by Rawles' affidavit. For reasons that will become apparent during our later consideration of the substantive issues, we are persuaded that the newly discovered facts lend substantial support to Appellants' claims, and that in the interest of securing a fair and just result in this important litigation those facts should have been considered. In their motion to set aside the summary judgment Appellants explained that they had known earlier of Wantland's statement to Rawles shortly before the murder, but that they had only learned of Rawles having communicated that information to Ruffin during a meeting with Rawles in preparation for trial on May 24, 1983. Further, Appellants stated they had not learned of Rawles' knowledge of the conversation between Gordon and Ruffin concerning the proposal to move Wantland into the mansion to provide additional security until they met with Rawles on June 15, 1983, to prepare his affidavit. Appellees did not suggest that Rawles' statements were untrue, nor did they suggest any lack of diligence on the part of Appellants' counsel that should act as a bar to the relief sought. The trial judge offered no explanation for his decision to deny the motion, and thus we are at a loss to know whether he accepted or rejected Appellants' explanation for the delay in discovering this new evidence. While we recognize the importance of achieving finality in litigation, particularly in the heavily burdened trial courts of this day, and we would not hesitate to affirm the denial of relief where a party without justification had failed to present relevant information necessary for a proper decision by the court, we do not view this case as fitting that mold. We shall therefore consider the facts presented by the Rawles affidavit in determining whether summary judgment was properly granted.

### III

### *Liability of Jones*

Appellants' claim against Jones is based upon a theory of negligent hiring or retention[2], a cause of action recently considered by this Court in *Cramer v. Housing Opportunities Comm'n*, 304 Md. 705, 501 A.2d 35 (1985). Appellants concede that Jones was not negligent in hiring Wantland to perform the duties of a carpentry instructor. They contend, however, that Jones was negligent in later extending Wantland's duties to include caretaking and security functions, and that in any event Jones was negligent in retaining Wantland in any security or caretaking capacity after receiving notice of Wantland's statement to Rawles concerning his intended treatment of suspected vandals.

The trial judge ruled that the uncontested facts demonstrated Wantland had been hired only as a carpentry instructor. Our review of the record leads us to conclude that there exists a genuine dispute of fact as to whether Wantland had been authorized by Jones to perform the additional duties of caretaking and security.

By the terms of its agreement with the College, the County assumed occupancy and control of the property and assumed "all maintenance, upkeep and security costs." Additionally, the County was required to provide security to protect tools, training aids, and materials owned by it and

---

**2.** Appellants also claimed Jones was liable as an occupier of the land, and as an employer under the doctrine of *respondeat superior.* The facts submitted to the trial court were insufficient to support a finding that there had been any demise or surrender of control of the land to Jones, or that the conduct of Wantland was within the scope of his employment. Additionally, Appellants alleged that Jones was under a duty to control Wantland because of the existence of a special relationship between them. *See Restatement (Second) of Torts* §§ 314–320 (1965). If Appellants' claim was grounded on the belief that Jones had "taken charge of" Wantland within the meaning of § 319 of the *Restatement,* it fails because Wantland was not in custody. *Lamb v. Hopkins,* 303 Md. 236, 492 A.2d 1297 (1985). To the extent the claim of a special relationship is based on § 317 it does not differ from the claim of negligent hiring or retention.

by the Federal Government and kept at the training site. The County's contract with Jones required that Jones "establish and maintain a property control system in accordance with the United States Department of Labor requirements to insure adequate safeguards to prevent loss, damages, or theft of property of the [County]." The funds allotted for Jones' use included a line item of $500.00 for maintenance of the alarm system on the property, and $3,200.00 for security, upkeep, and maintenance of the premises for four months.[3] It is clear from the record that security and caretaking duties were given to Ruffin, the Assistant Director of the project and an employee of Jones, but there is a dispute as to whether the County contracted directly with Ruffin for the performance of these duties, or Jones assigned the additional duties to Ruffin. There is also a dispute as to whether Ruffin was to receive additional pay for the performance of these duties, or was to be compensated by being furnished lodging at the site. It is admitted that Ruffin lived on the premises; that the arrangement was made or approved by Gordon, who served as Director of the project for Jones; and, that a purpose of the arrangement was to provide better security for the premises. In his answer to interrogatories, Jones identified Ruffin when asked to "identify ... every individual employed by you at the Clinton Center project in the capacity of caretakers or security personnel." In a subsequent answer, Jones said, "[t]here was no salary paid.... He was provided with living quarters at the training site." Finding these facts sufficient to allow a jury to conclude that Jones contracted with the County to perform required caretaking and security duties, and that Jones in turn assigned Ruffin to carry out these duties, we turn to the involvement of Wantland. The record shows that Wantland was also furnished lodging at the site. Furthermore, there

---

3. Although the contract documents are not entirely clear on this point, it appears the four month period intended was April 1 to August 1, 1978.

is evidence that the arrangement was similar to that made with Ruffin, in that the consideration was at least in part to provide additional security. In his affidavit, Rawles said:

That about a week or two weeks before I heard that Donald Henley was killed, I heard Albert Ruffin and Milton Gordon talking about these burglaries. I heard them talk about moving Wantland into the Mansion to be sure that someone was there at night to help prevent the thefts.

In his deposition, Ruffin confirmed he had talked with Gordon about moving Wantland onto the site, and had discussed the reason for the arrangement. He said that although he recalled agreeing with the reason given by Gordon, he could not then recall what the reason was. Ruffin also testified that he and Wantland had agreed that one of them would remain on the site at all times to secure the property against vandals. Patricia Lau, who was employed by Jones as a secretary and occupied an office on the site, testified of her contemporaneous knowledge of the break-ins and the vandalism, and her "understanding", derived from general conversation, that Wantland and Ruffin were "supposed to coordinate their times of being there" for security purposes. Additionally, the statement made by Wantland to Rawles concerning Wantland's alleged knowledge of the identity of a vandal and his intent if he was successful in catching him is sufficient to support the conclusion that Wantland believed he had been assigned security duties.

Considering the totality of this evidence, we conclude the trier of fact could find that Gordon and Ruffin were managerial employees of Jones with authority to assign additional duties to other employees of Jones, and that acting in that capacity, they assigned Wantland security duties to be carried out jointly with Ruffin, and compensated Wantland for these additional duties by arranging lodging for him on the site. Accordingly, summary judgment should not have been granted in favor of Jones on the basis

of there being no evidence of a hiring or retention of Wantland for any duties other than as carpentry instructor.

The Court of Special Appeals advanced as an alternative ground for affirming the action of the lower court the absence of evidence to prove the element of proximate cause. Although an appellate court may in an appropriate case affirm a decision for a reason other than that relied upon by the trial judge, *Robeson v. State,* 285 Md. 498, 501–02, 403 A.2d 1221 (1979), *cert. denied,* 444 U.S. 1021, 100 S.Ct. 680, 62 L.Ed.2d 654 (1980), we decline to do so here. As we pointed out in *Metropolitan Mtg. Fd. v. Basiliko,* 288 Md. 25, 27–29, 415 A.2d 582, (1980), a trial judge possesses broad discretion to deny a summary judgment even though the technical requirements for entry of such a judgment have been met. The effect of our ruling on the issue of proximate cause, or on any other issue not considered by the trial judge, would be to deprive the trial judge of discretion to deny or to defer until trial on the merits the entry of judgment on such issues.

Because this case must be remanded for further proceedings, we shall make certain observations concerning issues presented by the facts. This involves the test of foreseeability of harm, and the utilization of that test either in determining the existence of a duty owed to the Plaintiff or in resolving the issue of proximate cause. The concept that all persons owe a duty to all other persons to use reasonable care to protect them from harm must be limited if we are to avoid liability for unreasonably remote consequences. The requirement that specific negligent conduct be a legally cognizable cause as well as a cause in fact of the harm has come to be known as the requirement of proximate cause. *See Evans v. State,* 304 Md. 487, 531–33, 499 A.2d 1261 (1985); *Scott v. Watson,* 278 Md. 160, 171–73, 359 A.2d 548 (1976); and *Peterson v. Underwood,* 258 Md. 9, 264 A.2d 851 (1970). And at least since 1928 when Judge Cardozo wrote *Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 162 N.E. 99 (1928) courts have given further effect to

the social policy of limitation of liability for remote conse-
quences by narrowing the concept of duty to embrace only
those persons or classes of persons to whom harm of some
type might reasonably have been foreseen as a result of the
particular tortious conduct. In *Prosser and Keeton on The
Law of Torts* § 53 (W. Keeton 5th ed. 1984) the authors
conclude that the limitation of causation by the use of the
modifier "proximate" and the limitation of duty by the
requirement of foreseeability are fundamentally similar.
*See also Semler v. Psychiatric Institute of Washington,
D.C.,* 538 F.2d 121 (4th Cir.1976).

■ This Court has found that the two theories are not
mutually exclusive, *Owens v. Simon,* 245 Md. 404, 409, 226
A.2d 548 (1967), but are closely related, *Liberto v. Holfeldt,*
221 Md. 62, 67, 155 A.2d 698 (1959). *See also Folk v.
Bossler,* 256 Md. 232, 235–39, 260 A.2d 64 (1969); *McGow-
ans v. Howard,* 234 Md. 134, 138, 197 A.2d 915 (1964);
*Resavage v. Davies,* 199 Md. 479, 484–85, 86 A.2d 879
(1952). In applying the test of foreseeability in either
context it is well to keep in mind that it is simply intended
to reflect current societal standards with respect to an
acceptable nexus between the negligent act and the ensuing
harm, and to avoid the attachment of liability where, in the
language of Section 435(2) of the *Restatement (Second) of
Torts* (1965), it appears "highly extraordinary" that the
negligent conduct should have brought about the harm.

■ The application of the foreseeability requirement to
determine the existence of a duty has in some cases
spawned the belief that a duty will be found only in favor of
"identifiable plaintiffs," *i.e.,* those within a foreseeable zone
of danger whose identities are known in advance. There
will, of course, be instances in which the ability to identify
the person or persons subjected to an increased risk of
harm by the negligent action of a defendant will be impor-
tant in the determination of the existence of a particular
duty, or in determining the nature of that duty. The cases
of *Tarasoff v. Regents of University of California,* 17

Cal.3d 425, 551 P.2d 334, 131 Cal.Rptr. 14 (1976); and *Thompson v. County of Alameda*, 27 Cal.3d 741, 614 P.2d 728, 167 Cal.Rptr. 70 (1980) illustrate the point. In *Tarasoff* a dangerous patient had informed his psychologist of his intent to kill an un-named, but readily identifiable woman. In *Thompson* a juvenile delinquent known to have dangerous propensities notified his custodians that he would, if released, take the life of some young child living in his neighborhood. He gave no indication of which, if any particular young child he intended as his victim. In considering the existence of a duty to warn, the California Supreme Court noted that the victim in *Tarasoff* was readily identifiable, and notification was feasible, so that it was reasonable to impose a duty to warn the intended victim of the impending danger. The court held in *Thompson*, however, that it was impossible to identify a particular victim in advance, and that under all of the circumstances it would be unrealistic and contrary to sound policy to require general warnings to the public before releasing any prisoner who had a violent history and who had made non-specific threats of harm directed at non-specific victims. Noting that the County was immune from liability for its discretionary acts in determining to release the juvenile and in selecting the juvenile's mother as an appropriate custodian, and finding that there was no duty to notify the juvenile's mother of the threat made earlier, the California Court rejected the *Thompson* claim.[4] What must be kept in mind is that the question of foreseeable identification of a plaintiff, while

---

**4.** Justice Tobriner, author of the majority opinion in *Tarasoff*, and Justice Mosk, who concurred in that opinion, dissented. They argued that the victim was a young child residing in the immediate neighborhood of the delinquent, that he was therefore clearly within the class of persons subjected to an enhanced risk by the release of the delinquent, and that the question of whether the victim could be identified went only to the determination of whether notice was feasible as a means of discharging the duty, and not to the existence of the duty. For additional discussion of the *Tarasoff* and *Thompson* cases, *see Peterson v. State*, 100 Wash.2d 421, 671 P.2d 230 (1983), and the concurring opinion of Judge Rothstein in *Vu v. Singer Co.*, 706 F.2d 1027, 1031 (9th Cir.1983).

relevant to the determination of the existence of *a duty to warn,* is not necessarily relevant to the existence of other duties that may arise. As the dissenting justices pointed out in *Thompson,* a physician must warn a patient if the patient's condition or the probable effects of medication administered will render certain conduct, such as driving a car, dangerous to others, but it would be absurd to confine that duty to motorists or pedestrians whom the physician could identify in advance. In that instance, while the duty extends to a large class, it can be discharged by a proper warning to the patient. The question facing the *Thompson* court was whether any duty reasonably capable of being discharged by the defendant existed under the particular circumstances of that case.

■ The claim here made against Jones is readily distinguishable. The duty of an employer, as explicated in *Evans v. Morsell,* 284 Md. 160, 395 A.2d 480 (1978) and *Cramer v. Housing Opportunities Comm'n, supra,* is to use reasonable care to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee. The class of persons intended to be protected by the imposition of this duty necessarily includes those members of the public who would reasonably be expected to come into contact with Wantland in his performance of security duties. That such persons could not be identified in advance does not mean that they are not included in the class.

■ Foreseeability as a factor in the determination of the existence of a duty involves a prospective consideration of the facts existing at the time of the negligent conduct. Foreseeability as an element of proximate cause permits a retrospective consideration of the total facts of the occurrence, including the criminal acts of a third person occurring after the original act of negligence of a tortfeasor. Without attempting to establish a "bright line" rule applicable in every case, we conclude that under the circumstances of this case the question of the sufficiency of the nexus

between the alleged negligence of Jones and the fatal assault upon Donald, involving as it does a retrospective consideration of the precise facts of the occurrence, is properly addressed as an issue of proximate cause rather than one involving the existence of a duty owed to the plaintiff.

Accordingly, the causation problem that exists under the facts of this case involves proof of an appropriate nexus between the assignment of security duties to Wantland and the slaying. *See Cramer v. Housing Opportunities Comm'n, supra,* 304 Md. at 713, 720–21, 501 A.2d 35. It is at least a permissible conclusion that a suspected vandal would be within the class of persons subjected to an increased risk of harm by the negligent assignment of security duties to Wantland, and thus the test of foreseeability may be met if it is shown that Wantland was engaged in activities related to security duties and the victim was a suspected vandal.

## IV

### *Liability of the College*

Appellants contend the College is liable as the owner and occupier of the land where these tragic events occurred. We conclude that summary judgment was properly entered in favor of the College because the uncontested facts demonstrate beyond dispute that the College had surrendered control of the premises to the County during the period of time involved in this action. The applicable principle of law is well stated in *Prosser and Keeton on The Law of Torts* § 63, at 434 (W. Keeton 5th ed. 1984):

> When land is leased to a tenant, the law of property regards the lease as equivalent to a sale of the premises for the term. The lessee acquires an estate in the land, and becomes for the time being both owner and occupier, subject to all of the responsibilities of one in possession, to those who enter upon the land and those outside of its boundaries. (Footnotes omitted.)

Even a temporary surrender of possession not accompanied by a lease may relieve an owner of liability for unsafe conditions arising after his surrender. *See Restatement (Second) of Torts* § 422 Comment *c* involving relinquishment of possession to a contractor for construction, demolition, or repair.

The Use Agreement entered into between the College and the County granted to the County the right to "use and occupy" the property for a specified term, and provided that "[t]he County shall return said property to the College in a condition no worse than the condition of the property prior to the Use Agreement." The agreement conveyed the exclusive right of occupancy to the County, and therefore effectively transferred to the County the duties owed by an occupier of land.

V

*Liability of the County*

Appellants' claim against the County for negligence rests upon an alleged breach of duty arising from the County's occupancy of the land. The trial judge concluded that Wantland was a bare licensee residing on the premises as a result of the benevolence of the County, and that the County therefore owed no greater duty to Donald than it did to Wantland. Judge Rea also found no duty on the part of the County to warn of the presence of Wantland, and no evidence of a violation of the duty owed to Donald as a bare licensee, *i.e.*, the duty not to willfully or wantonly injure or entrap him. *See Sherman v. Suburban Trust Co.*, 282 Md. 238, 242, 384 A.2d 76 (1978); *Bramble v. Thompson*, 264 Md. 518, 521, 287 A.2d 265 (1972); *Crown Cork and Seal Co. v. Kane*, 213 Md. 152, 157, 131 A.2d 470 (1957); *Carroll v. Spencer*, 204 Md. 387, 394, 104 A.2d 628 (1954).

For the reasons set forth in Part III of this opinion we conclude the trier of fact could find that Wantland was furnished lodging in return for his agreement to perform security duties. As previously noted, Jones contends that

Ruffin had a separate contract with the County to provide security, and there is some support for that in the testimony given by Ruffin. If that was indeed the case, or if Appellants can show that Ruffin or Gordon secured permission from the County for Wantland to reside at the premises in return for providing extra security for the benefit of the County, the trier of fact could find an arrangement for the mutual benefit of Wantland and the County and thus afford Wantland the status of invitee on the property. We have carefully reviewed the record on this point, and we believe there is sufficient evidence to create a genuine dispute concerning this material fact.

There is also sufficient evidence to permit a finding that Wantland invited Donald onto the premises. Although Donald would thus enjoy only the status of a social guest as to Wantland on that portion of the property occupied by Wantland, Donald would enjoy the status of invitee as to the County on that part of the land retained in its control. *Landay v. Cohn,* 220 Md. 24, 150 A.2d 739 (1959); *Ross v. Belzer,* 199 Md. 187, 85 A.2d 799 (1952); *Kalus v. Bass,* 122 Md. 467, 89 A. 731 (1914); *Murray v. Lane,* 51 Md.App. 597, 444 A.2d 1069 (1982).

An occupier of land has a duty to use reasonable and ordinary care to keep the premises safe for an invitee and to protect him from injury caused by an unreasonable risk that the invitee, by exercising ordinary care for his own safety, will not discover. *Sherman v. Suburban Trust Co., supra,* 282 Md. at 242, 384 A.2d 76. In *Scott v. Watson, supra,* 278 Md. at 166–67, 359 A.2d 548, this Court declined to impose a special duty upon landlords to protect their tenants from criminal activity, but held that the general duty to exercise reasonable care for an invitee's safety may include under some circumstances a duty to take reasonable measures to eliminate conditions contributing to criminal activity. As occupier of the land pursuant to the Use Agreement with the College, the County had authority to remove Wantland from the property if it had notice that his

continued presence presented an unreasonable risk of danger to invitees. Whether the County reasonably had available to it this or any other action to avoid the danger depends upon a number of factors, including: the County's role in the arrangements made with Ruffin and Wantland concerning security; whether the County had actual or imputed knowledge 1) that Wantland was living on the premises and/or 2) of the statement Wantland had allegedly made to Rawles regarding his intention as to suspected vandals; and, whether there was sufficient time following receipt of notice to take effective action. We point out that under familiar principles of agency law notice given to Ruffin may have been imputed to Jones but not to the County if Ruffin was the employee of Jones but Jones had no fiduciary relationship with the County. *See Unsat. C. & J. Fund Bd. v. Fortney*, 264 Md. 246, 255–56, 285 A.2d 641 (1972). Notice to an independent contractor may or may not constitute notice to the principal, depending upon whether the independent contractor is also an agent[5], and depending upon whether the notice is within the sphere of his authorized activity or concerns a matter about which he has a duty to report. W. Seavey, *Handbook on the Law of Agency* § 6, at 8 (1964); F. Mechem, *A Treatise on the Law of Agency* Vol. 1 § 40, Vol. 2 §§ 1802–1804 (2d ed. 1914); 3 *Merrill on Notice* § 1203A, § 1247 (1952).

These issues, as well as the issue of proximate cause discussed in Section III, are properly resolved by trial and not by summary judgment.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY IN FAVOR OF THE

---

**5.** Independent contractors generally considered to be agents include attorneys, auctioneers, brokers, factors, and other similar persons who conduct transactions for their principal. W. Seavey, *Handbook on the Law of Agency* § 6, at 8 (1964).

BOARD OF TRUSTEES OF PRINCE GEORGE'S COMMU-
NITY COLLEGE, AND TO REVERSE THE JUDGMENTS
IN FAVOR OF JOHN H. JONES AND PRINCE
GEORGE'S COUNTY, MARYLAND, AND REMAND FOR
TRIAL. COSTS TO BE PAID ONE–THIRD BY APPEL-
LANTS AND TWO–THIRDS BY JOHN H. JONES AND
PRINCE GEORGE'S COUNTY, MARYLAND.