624 A.2d 496

Marc B. STONE

v.

CHICAGO TITLE INSURANCE COMPANY OF MARYLAND et al.

No. 121, Sept. Term, 1992.

Court of Appeals of Maryland.

May 12, 1993.

330

Steven C. Kahn (Pearlstein, Essex & Kahn, P.C., both on brief), Beltsville, for appellant.

Alvin I. Frederick (James E. Dickerman, Eccleston and Wolf, all on brief), Baltimore, and Russel A. Arlotta (Richard A. Kramer, Kramer & Gorney, Chtd., all on brief), Oxon Hill, for appellee.

Argued before ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI, ROBERT M. BELL and CHARLES E. ORTH, Jr., Judge of Court of Appeals (retired, specially assigned), JJ.

KARWACKI, Judge.

## I.

In September of 1989, Marc Stone, the appellant, purchased a home in Washington, D.C. for $285,000. James E. Savitz and his law firm, Gimmel, Weiman, Savitz and Kronthal, P.A., were employed by Stone to handle the settlement of that purchase, including the examination of the title of the property for marketability, document preparation, the release of any liens encumbering the property, and obtaining a title insurance policy. At settlement on September 15, 1989, a title insurance policy was issued by Chicago Title Insurance Company of Maryland. In June, 1990, Stone applied to Maryland National Bank for a home equity loan in the amount of $50,000 to purchase "stock puts" to protect his financial position in the stock market in response to anticipated margin calls on certain stocks he had purchased on credit. The loan was to be secured by a second mortgage on his home. The loan was provisionally approved on July 2, however, in mid-July, the bank notified Stone that a deed of trust which encumbered his seller's title had not been released of record. Between July 18 and August 2, Stone and representatives of Maryland National Bank and its title company made numerous attempts to contact Savitz or someone else at his law firm to get the deed of trust which was recorded against his home released. Meanwhile, on August 1, 1990, Stone's broker called his margin account loans with an August 9, 1990 pay-off date. Without the home equity loan funds, Stone was forced to sell stock at a substantial loss to meet his broker's demand.

In addition to these facts, in his amended complaint, Stone alleged that Savitz was not reached until early August when he proceeded to clear up the matter. The release of the outstanding lien was recorded on August 6, 1990. The loan funds from Maryland National were released on August 15, 1990. Stone alleges that as a result of Savitz's failure to record a release of the outstanding lien, he was unable to close on the home equity loan in a timely

fashion and, as a result, was forced to sell stock at a substantial loss to raise the money to meet the margin call. There was no allegation in the amended complaint that either Savitz, his firm, or Chicago Title had knowledge at any time that Stone was speculating on credit in the stock market and that the Maryland National home equity loan was the only source of funds available to him in case of financial emergency.

Stone filed suit in the Circuit Court for Montgomery County against the appellees, alleging negligence and breach of contract by Savitz and his firm and breach of contract by Chicago Title. The appellees moved to dismiss the amended complaint for failure to state claims upon which relief could be granted. Savitz and his firm asserted that the damages claimed for breach of contract were unforeseeable at the time they entered the contract with Stone; as to the damages claimed for their negligence, they contended that the damages were speculative and unforeseeable inasmuch as a causal nexus could not be demonstrated between their negligence and the injury suffered by Stone. Chicago Title similarly argued that the damages claimed by Stone for breach of contract were unforeseeable by the parties at the time the contract was entered. The motions were heard by Judge J. James McKenna who dismissed with prejudice the amended complaint as to all defendants following a hearing on July 1, 1992. Stone appealed to the Court of Special Appeals. Prior to arguments before the intermediate appellate court, we issued our writ of certiorari. 329 Md. 22, 616 A.2d 1286.

## II.

This appeal reaches us on a dismissal of the appellant's amended complaint for failure to state a claim upon which relief could be granted pursuant to Maryland Rule 2–322. In reviewing that judgment, we assume the truth of all relevant and material facts well pleaded and all inferences which can be reasonably drawn from those facts. *Figueiredo–Torres v. Nickel*, 321 Md. 642, 647, 584 A.2d 69, 72 (1991); *Sharrow v. State Farm Mut. Auto. Ins. Co.*, 306

Md. 754, 768, 511 A.2d 492, 499–500 (1986); *Flaherty v. Weinberg,* 303 Md. 116, 135–36, 492 A.2d 618, 628 (1985); *Tadjer v. Montgomery County,* 300 Md. 539, 542, 479 A.2d 1321, 1322 (1984); *Hoffman v. Key Fed. Sav. & Loan,* 286 Md. 28, 33–34, 416 A.2d 1265, 1268 (1979); *Arnold v. Carafides,* 282 Md. 375, 382, 384 A.2d 729, 733 (1978); *Krieger v. J.E. Greiner Co.,* 282 Md. 50, 52, 382 A.2d 1069, 1071 (1978); *Zion Evangelical Lutheran Church v. State Highway Admin.,* 276 Md. 630, 632, 350 A.2d 125, 126 (1976); *Schwartz v. Merchants Mort. Co.,* 272 Md. 305, 307–308, 322 A.2d 544, 546 (1974); *Desser v. Woods,* 266 Md. 696, 698–99, 296 A.2d 586, 588 (1972).

### III.

### A.

The first question presented is whether Savitz's failure to timely record the release of the deed of trust which encumbered the home which Stone purchased, leading to the delay in settlement of Stone's subsequent loan, was a proximate cause of Stone's loss. Put another way, was the possibility of Stone's stock market losses in August of 1990 foreseeable to Savitz in September of 1989 so that he should have known at that time that negligent handling of the settlement could proximately result in those losses nearly a year later.

Stone argues that his right to recover lies in tort. This Court has never expressly held that a malpractice claim arising from the contractual relationship between attorney and client lies exclusively in contract or in tort. This Court first considered the liability arising from an attorney-client relationship in *Cochrane v. Little,* 71 Md. 323, 18 A. 698 (1889) where we said:

"It is now well settled by many decisions of courts of high authority, both of England and of this country, that every client employing an attorney has a right to the exercise, on the part of the attorney, of ordinary care and diligence in the execution of the business intrusted to him, and to a fair average degree of professional skill and

knowledge; and if the attorney has not as much of these qualities as he ought to possess, and which, by holding himself out for employment he impliedly represents himself as possessing, or if, having them, he has neglected to employ them, the law makes him responsible for the loss or damage which has accrued to his client from their deficiency or failure of application."

*Id.* at 331–32, 18 A. at 700–01.

In *Watson v. Calvert Bldg. Assn.*, 91 Md. 25, 45 A. 879 (1900), we stated:

"An attorney at law is liable to his client for the possession of a reasonable degree of skill in his profession as well as for the exercise of a like degree of diligence in the conduct of the transaction about which he is employed. If he fails in either respect he will be responsible to his client for the loss which the latter may sustain therefrom. This responsibility of the attorney, although ordinarily enforced by an action of case for negligence in the discharge of his professional duties, in reality rests upon his employment by the client and is contractual in nature. Before the attorney can be made liable, it must appear that the loss for which he is sought to be held arose from his failure or neglect to discharge some duty which was fairly within the purview of his employment."

*Id.* at 33, 45 A.2d at 881.

In *Kendall v. Rogers*, 181 Md. 606, 31 A.2d 312 (1943), this Court quoted *Maryland Casualty Co. v. Price*, 231 F. 397, 401 (4th Cir.1916) for the proposition:

" 'In a suit against an attorney for negligence, the plaintiff must prove three things in order to recover: (1) The attorney's employment; (2) his neglect of a reasonable duty; and (3) that such negligence resulted in and was the proximate cause of loss to the client'."

*Id.* at 611–12, 31 A.2d at 315.

Applying the standard to non-lawyer title abstracters in *Corcoran v. Abstract & Title Co.*, 217 Md. 633, 143 A.2d 808 (1958), we said:

"One who undertakes to examine a title for compensation is bound to exercise a reasonable degree of skill and diligence in the conduct of the transaction. This liability, 'although ordinarily enforced by an action of case for negligence in the discharge of his professional duties, in reality rests upon his employment by the client and is contractual in its nature.' It is generally recognized that damages are recoverable on the theory of a breach of contract, and the legal situation is not changed by the fact that the contractual act bargained for is negligently performed. Since the liability is contractual, it may be limited in its scope by apt clear language brought home to the employer."

*Id.* at 637, 143 A.2d at 810 (citations omitted).

In *Reamer v. Kessler*, 233 Md. 311, 196 A.2d 896 (1964), we held in a case involving a lender's attempted recovery from a negligent title attorney:

"In this State it has been held that the obligation of an attorney or abstracter examining and certifying title is contractual in nature, though it has been recognized in two cases that it has ordinarily been enforced by an action on the case alleging negligence in the discharge of the professional duty of an attorney."

*Id.* at 315, 196 A.2d at 899. The *Reamer* Court in a footnote concluded:

"We are inclined to think that in this case the damages would be the same whether the liability of the appellant were rested upon the assumption above stated or upon a tort or a breach of warranty. To avoid a lengthy and, we think, unnecessary discussion, we do not go into this matter, except to note that insofar as the foreseeability of damages is concerned, it appears the same in either contract or tort."

*Id.* at n. 1. See also *Flaherty v. Weinberg*, 303 Md. 116, 134, 492 A.2d 618, 627 (1985); *Wlodarek v. Thrift*, 178 Md. 453, 462, 13 A.2d 774, 778–79 (1940). We need not decide here whether the damages under a legal malpractice claim should be determined under a tort or contract analysis

because under the facts of the instant case either approach results in an affirmance of the trial court's judgment.

B.

 Negligence is not actionable unless it is a proximate cause of the harm alleged. *Atlantic Mut. Ins. Co. v. Kenney,* 323 Md. 116, 127, 591 A.2d 507, 512 (1991); *Cramer v. Housing Opportunities Comm'n,* 304 Md. 705, 713, 501 A.2d 35, 39 (1985); *Scott v. Watson,* 278 Md. 160, 165, 359 A.2d 548, 552 (1976). Our analysis of foreseeability in the proximate cause context turns on whether the actual harm to the appellant fell within a general field of danger that Savitz should have anticipated, rather than whether the harm was the specific kind that he should have expected. *Moran v. Faberge,* 273 Md. 538, 551, 332 A.2d 11, 19 (1975); *Segerman v. Jones,* 256 Md. 109, 132, 259 A.2d 794, 805 (1969); *Dalmo Sales v. Steinberg,* 43 Md.App. 659, 672–73, 407 A.2d 339, 346–47 (1979).

In addressing the aspect of foreseeability in the determination of proximate cause, the *Restatement (Second) of Torts* § 435(2) (1965) states:

"The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm."

Comment c to that section explains:

"Where it appears to the court in retrospect that it is highly extraordinary that an intervening cause has come into operation, the court may declare such a force to be a superseding cause. Analytically, the highly extraordinary nature of the result which has followed from the actor's conduct (with or without the aid of an intervening force) indicates that the hazard which brought about or assisted in bringing about that result was not among the hazards with respect to which the conduct was negligent. Strictly, the problem before the court is one of determining whether the duty imposed on the actor was designed

to protect the one harmed from the risk of harm from hazard in question. However, courts frequently treat such problems as problems of causation."

(citations omitted).

We adopted this view in *Henley v. Prince George's County*, 305 Md. 320, 503 A.2d 1333 (1986) where Judge McAuliffe, writing for the Court, opined:

"In applying the test of foreseeability ... it is well to keep in mind that it is simply intended to reflect current societal standards with respect to an acceptable nexus between the negligent act and the ensuing harm, and to avoid the attachment of liability where, in the language of Section 435(2) of *Restatement (Second) of Torts* (1965), it appears 'highly extraordinary' that the negligent conduct should have brought about the harm."

*Id.* at 334, 503 A.2d at 1340.

Later, he stated:

"Foreseeability as a factor in the determination of the existence of a duty involves a prospective consideration of the facts existing at the time of the negligent conduct. Foreseeability as an element of proximate cause permits a retrospective consideration of the total facts of the occurrence, including the criminal acts of a third person occurring after the original act of negligence of a tortfeasor."

*Id.* at 336, 503 A.2d at 1341. *See also Atlantic Mut. Ins. Co. v. Kenney*, 323 Md. at 129–30, 591 A.2d at 515.

### C.

This Court adopted the foreseeable damages rule applicable to contract actions from *Hadley v. Baxendale*, 9 Exch. 341 (1854), in our opinion in *United States Telegraph Co. v. Gildersleve*, 29 Md. 232 (1868):

"The case of *Hadley v. Baxendale* was this: The plaintiffs, owners of a steam mill, broke a shaft, and desiring to have another made, they left the broken shaft with the defendant, a carrier, to take to an engineer to serve as a model for a new one. At the time of making the contract,

the defendant's clerk was informed that the mill was stopped, and that the plaintiffs desired the broken shaft to be sent immediately. Its delivery was delayed, however, and the new shaft kept back in consequence. The plaintiffs brought their action for a breach of this contract with the carrier, and they claimed, as special damages, the loss of profits while the mill was kept idle. But because it was not made to appear that the defendant was informed that the want of the shaft was the only thing that was keeping the mill from operating, it was held that he could not be made responsible to the extent claimed. And the court, in delivering its judgment, said: 'We think the proper rule in such a case as the present, is this—where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be, either such as may fairly and substantially be considered as arising naturally, *i.e.*, according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it. Now, if the special circumstances under which the contract was actually made, were communicated by the plaintiff to the defendant, and thus known to both parties, the damages resulting from the breach of such a contract which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of a contract under these special circumstances so known and communicated.

"But on the other hand, if those special circumstances were wholly unknown to the party breaking the contract, he, at the most, could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the great multitude of cases, not affected by any special circumstances for such a breach of contract. For, had the special circumstances been known, the parties might have expressly provided for the breach of contract by special terms as to the damages in that

case, and of this advantage it would be very unjust to deprive them.'"

*Id.* at 249–53. *See also Phipps v. General Motors Corp.,* 278 Md. 337, 353, 363 A.2d 955, 963–64 (1976) ("where there is injury to a married person, recovery for damages to marriage relationship in a breach of warranty action would clearly seem to be allowable as consequential damages under the principles of *Hadley v. Baxendale* "); *Macke Co. v. Pizza of Gaithersburg, Inc.,* 259 Md. 479, 488, 270 A.2d 645, 650 (1970) (under foreseeability concept, plaintiff must show breach of contract caused loss of profits within contemplation of parties and probable result of breach in order to recover unrealized profits); *Pennsylvania Threshermen & Farmers' Mut. Casualty Ins. Co. v. Messenger,* 181 Md. 295, 300–01, 29 A.2d 653, 656 (1943) ("amount of damages recoverable for breach of contract is such as may reasonably be considered as arising naturally from the breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it"); *Middendorf, W. & Co. v. Milburn Co.,* 134 Md. 385, 392–93, 107 A. 7, 9–10 (1919) (citing to *Hadley* for rule of damages in cases of breach of contract); *Winslow Elevator & Mach. Co. v. Hoffman,* 107 Md. 621, 635–36, 69 A. 394, 398 (1908).

### D.

█ In the instant case, Stone would have us hold that his loss arising from the August, 1990 collapse in the market in certain stocks in which he was speculating was proximately caused by his sale of those stocks, which was caused by his lack of funds to pay off other loans, which was caused by his inability to secure a second mortgage before August 6, 1990, which in turn was caused by Savitz's failure to record timely the release of the extinguished lien on his home. He argues that but for Savitz's negligence he would have secured a home equity loan and used the proceeds to meet his broker's margin call, thus avoiding the sale of stock to raise capital in a falling market. We

disagree. We believe that Stone's stock market damages were a highly extraordinary result of Savitz's failure to timely record the release. We hold that there was no acceptable nexus between Savitz's negligent conduct and the stock market losses suffered by Stone and, consequently, that Savitz's negligence was not the proximate cause of the ensuing harm which befell Stone.

There was no allegation in the amended complaint that Savitz or his firm had knowledge at any time that Stone was buying stock on margin. No reasonable person would have foreseen that almost a year after the settlement which Savitz conducted Stone would have an emergency need for cash, would attempt to borrow against his home to satisfy that need, and unable to do so would have to sell stock in a depressed market to raise it. Furthermore, there is no allegation that Savitz was notified of Stone's financial crisis at the time the problem was brought to his attention. The result might be different if Stone had informed Savitz at the settlement, or when notifying Savitz of the outstanding lien against his home, that he was an active player in the stock market, that he had purchased stock on margin, and that one of the purposes for purchasing the house was to have a ready source of collateral should he have to raise cash to meet a margin call to avoid the need to sell stock in a weak market.

 Alternatively, under a contract analysis, these damages would not be foreseeable within the scope of the attorney-client relationship because of Stone's failure to inform Savitz of these special conditions and terms. In the instant case the contract was for Savitz to examine the title and file the necessary documents to deliver clear title for the property to Stone. While Savitz concedes he failed to record timely a release of a satisfied deed of trust, that breach of his contract with Stone has now been cured.

## IV.

 The second question raised is the propriety of the dismissal of Stone's claim against Chicago Title. An insur-

ance policy is a contract, *District–Realty Title Ins. Corp. v. Jack Spicer Real Estate, Inc.*, 280 Md. 422, 423, 373 A.2d 952, 953 (1977), and we shall apply the principles discussed above in determining the liability for damages arising from breach. As we have stated, in order for an aggrieved party to recover for another's breach of contract, the damages sought must arise naturally from the breach of contract itself or must have been reasonably within the contemplation of the parties at the time the contract was entered. We hold that Stone's stock market losses fail to meet that test.[1]

*JUDGMENT AFFIRMED, WITH COSTS.*

---

1. We recognize the trial court decided the dismissal of the amended complaint against Chicago Title on other grounds. We have held that while an appellate court will not ordinarily consider an issue not previously raised in the trial court, where the trial court sustained a demurrer on one ground, this Court is not confined to the reasons assigned by the counsel or court and may affirm on another ground. *Lease v. Upper Potomac River Comm'n,* 179 Md. 543, 544, 20 A.2d 498, 499 (1941). "Under Md.Rule 2–322, a motion to dismiss for failure to state a claim serves the same function as the demurrer under former Rules 345 and 371b." *Sharrow v. State Farm Mut. Auto. Ins. Co., supra,* 306 Md. at 768, 511 A.2d at 499–500 and cases cited therein.