696 A.2d 491

**MONTGOMERY CABLEVISION LIMITED PARTNERSHIP, et al.**

v.

**Julia D. BEYNON, et al.**

**No. 841, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

July 3, 1997.

366

Hugh E. Donovan (Donovan & Broderick, P.C., Silver Spring and John G. Packard, Baltimore, on the brief), for appellant, Cablevision.

Nancy L. Harrison, Annapolis, for appellant Lumbermens Mut.

Charles B. Day (David Barmak, Mark S. Carlin and Sherman, Meehan & Curtin, P.C., on the brief), Washington, DC, for appellees.

Argued before MURPHY, C.J., EYLER, J., and THEODORE G. BLOOM, Judge (retired), Specially Assigned.

THEODORE G. BLOOM, Judge, Specially Assigned.

Appellees, Julia D. Beynon, individually and as personal representative of her son's estate, and Douglas K. Beynon, Sr., filed in the Circuit Court for Montgomery County complaints against James R. Kirkland, James Lee, and Montgomery Cablevision Limited Partnership, doing business as Cable TV Montgomery ("Montgomery Cable"). Lumbermens Mutual Casualty Company ("Lumbermens") intervened as a defendant. In a consolidated trial, the jury returned verdicts for substantial sums against the defendants. Montgomery Cable and Lumbermens, appealing from the judgments entered on those verdicts, present several questions for our review.

## ISSUES

Montgomery Cable and Lumbermens both raise the following issues, albeit in somewhat different language:

1. Did the trial court err in failing to find that the decedent was contributorily negligent as a matter of law?

2. Did the trial court err in failing to find as a matter of law that there can be no recovery for "pre-impact fright"?

3. Was there any evidence to sustain the judgment for pecuniary losses?

Montgomery Cable also raises the following three issues:

4. Was there any evidence of primary negligence on the part of appellant Montgomery Cable?

5. Was there any evidence that any act of appellant Montgomery Cable was a proximate cause of the injuries and damages sustained by appellees?

6. Did the trial court err in instructing the jury on: (a) sudden emergency; (b) the State Police's responsibility in

controlling traffic; (c) presumptions regarding decedent's conduct?

Lumbermens presents two additional issues:

7. Did the trial court err in refusing to permit appellants' expert witness to testify regarding photographs of the accident scene?

8. Is intervenor Lumbermens Mutual Casualty Company entitled to judgment on cross-claims against the individual defendants?

## FACTS

At some point during the late evening hours of 7 June 1990, Montgomery Cable discovered that one of its cables, having either broken or fallen from a utility pole, was in need of repair. Montgomery Cable also perceived that the Maryland State Police ("State Police") would have to stop traffic on Interstate 495 (the Capitol Beltway) so that a replacement cable could be re-positioned across both the inner and outer loops of that heavily travelled highway.[1]

Montgomery Cable informed the State Police that the repairs would take from five to ten minutes and requested that the Capitol Beltway be closed to traffic. Montgomery Cable employees were dispatched to the location of the damaged cable so they could begin preparing for the project before the State Police arrived. At some time after 2:00 a.m. on 8 June 1990, two State Police officers, one on the outer loop and one on the inner loop, successfully stopped traffic and indicated that the repairs could safely begin. Unfortunately, it took Montgomery Cable employees between thirty and forty-five minutes to secure the new cable. The prolonged delay caused a traffic backup of approximately one mile in each direction.

---

1. At the location of the cable repair, Interstate 495 consisted of four eastbound and four westbound lanes. On 7 and 8 June 1990, because of ongoing road construction, one lane on each loop had been rendered inaccessible to vehicular traffic; those lanes were blocked with bright-colored barrels and signs.

At the rear of the backup on the outer loop, James Kirkland was driving a tractor-trailer owned by James Lee.[2]

The jurors heard Mr. Kirkland testify that he brought his rig to a complete stop in the center lane of traffic, occasionally moving forward as the vehicles ahead of him did so. During that period of stop and go progress, he noticed that another large tractor-trailer was to his left, and he recalled that there may have been another truck of some sort to his right. In any event, he was certain that all lanes of traffic were full of vehicles. Mr. Kirkland had been waiting in this fashion for approximately five minutes when the rear of his truck was struck by a van. The driver of that van, Douglas K. Beynon, Jr., died, apparently instantly, from the impact.

The jurors also heard testimony that (1) immediately prior to the accident, the decedent was travelling at roughly fifty-five miles per hour, and (2) under ideal conditions a vehicle moving at that rate of speed would require 192 feet to come to a complete stop. The decedent's vehicle left skid marks of just over seventy-one feet before striking the rear of Mr. Kirkland's rig. Conflicting testimony was presented on the issue of whether the tail lights on Mr. Kirkland's trailer were functioning properly at the time of the accident.

At the conclusion of a lengthy trial, the court presented the jury with the following written questions:

(1) Have Plaintiffs established by a preponderance of the evidence that Defendant, James Kirkland, was negligent?

(2) Have Plaintiffs established by a preponderance of the evidence that Defendant, James Lee, was negligent?

(3) Have Plaintiffs established by a preponderance of the evidence that Defendant, Cable TV Montgomery, was negligent?

(4) If you do not believe Plaintiffs have established the negligence of either James Kirkland or James Lee or

---

2. At all relevant times, Mr. Kirkland was acting as an employee of Mr. Lee's company: K & L Transportation.

Cable TV Montgomery, please stop your deliberations here. If you indicated "YES" to any of the above questions, please continue.

(5) Have Defendants established by a preponderance of the evidence that Douglas K. Beynon, Jr., was negligent?

(6) If you believe Defendants have established the negligence of Douglas K. Beynon, Jr., please stop your deliberations here. If you indicated "NO" to this question, please continue.

The jurors answered "yes" to the first three questions and "no" to question five. They then awarded the following damages on that portion of the verdict sheet that directed them to "[i]ndicate the amounts you deem as compensation for Plaintiffs:"

| | |
|---|---|
| Decedent | |
| Pre–Impact Fright: | $1,000,000.00 |
| Funeral Expenses: | $ 2,000.00 |
| | |
| Douglas K. Beynon, Sr. | |
| Economic Losses: | $ 212,000.00 |
| Past Mental Pain/Suffering: | $ 500,000.00 |
| Future Mental Pain/Suffering: | $ 750,000.00 |
| | |
| Julia D. Beynon | |
| Economic Losses: | $ 165,000.00 |
| Past Mental Pain/Suffering: | $ 500,000.00 |
| Future Mental Pain/Suffering: | $ 750,000.00 |
| **TOTAL:** | **$3,879,000.00** |

Pursuant to Md.Code (1974, 1995 Repl.Vol.) § 11–108(b) of the Courts and Judicial Proceedings Article, the court reduced the $1,000,000 awarded for the decedent's "pre-impact fright" to $350,000. He otherwise entered judgments in accordance with the verdicts. This appeal followed.

## DISCUSSION

### I.

Both appellants argue that the decedent was contributorily negligent as a matter of law and, therefore, that the court erred in submitting the issue of contributory negligence

to the jury. We are persuaded, however, that the evidence generated a jury question on this issue. The trial court cannot take the issue of contributory negligence from the jury unless no reasonable person could reach a contrary conclusion. *Campbell v. Baltimore Gas & Elec. Co.*, 95 Md.App. 86, 94, 619 A.2d 213, *cert. denied*, 331 Md. 196, 627 A.2d 538 (1993); *Le Vonas v. Acme Paper Board Co.*, 184 Md. 16, 40 A.2d 43 (1944).

> In order that a case may be withdrawn from a jury on the ground of contributory negligence, the evidence must show some prominent and decisive act which directly contributed to the accident and which was of such a character as to leave no room for difference of opinion thereon by reasonable minds.... In addition, before a person killed in an accident can be declared to have been guilty of contributory negligence as a matter of law, the trial court must give consideration to the presumption that he exercised ordinary care for his own safety....

*Baltimore & Ohio R.R. Co. v. Plews*, 262 Md. 442, 454, 278 A.2d 287 (1971) (quoting *Baltimore Transit Co. v. State for Use of Castranda*, 194 Md. 421, 434, 71 A.2d 442 (1950)).

██ Appellants contend that the testimony of the accident reconstruction experts established beyond any doubt that Kirkland's trailer was clearly visible and that the decedent contributed to the happening of the accident because he was not paying attention to the roadway in front of him. The jurors did hear testimony that Kirkland's trailer was equipped with several rear lights and that, if the lights were functioning properly at the time of the accident, the trailer would be visible from several hundred feet away. There was a dispute, however, over the number of lights that were functioning on that occasion. The distance at which the decedent could see the lights is a question of fact that was properly submitted to the jury.

## II.

Both appellants contend that the court erred in failing to rule as a matter of law that there could be no recovery for

"pre-impact fright." They objected to the court's inclusion on the verdict sheet of a "pre-impact fright" category of damages, to the court's instructions on that issue, and to the court's allowing appellee's counsel to advance an argument to the jury with respect to an award of such damages. On appeal, their arguments are broadly, rather than pointedly, stated, admitting to various interpretations. They assert that in this case there was no evidence to support such an award, and their contention that under Maryland law there can be no recovery for "pre-impact damages" can be interpreted as asserting:

(1) that as a matter of law such damages can never be awarded in any case;

(2) that as a matter of law, such damages can never be awarded when the victim of a tort does not survive the impact and thus suffers no conscious pain or suffering; or

(3) that as a matter of law, on the basis of the evidence in this case, no damages could be awarded for "pre-impact fright."

Before we address the foregoing contentions, we deem it appropriate to distinguish between the two causes of action that arose from the tragic accident and death of Douglas K. Beynon, Jr.

At common law, if a victim of a tort died prior to recovery in tort, the victim's cause of action died as well. Similarly, the victim's survivors had no cause of action for their financial or emotional loss. States have changed this result by statute, although not all in the same way. In Maryland, a wrongful death statute permits recovery by dependents of the decedent, in accordance with its terms, Md.Code (1974, 1995 Repl.Vol., 1996 Supp.), §§ 3–901 through 3–904 of the Courts and Judicial Proceedings Article; by separate statute, a survival action permits a personal representative to sue on behalf of the estate. Md.Code (1974, 1991 Repl.Vol., 1996 Supp.), § 7–401(x)(2) of the Estates & Trusts Article.

The distinction between the two causes of action was explained by Judge Moylan in *Globe American Casualty v.*

*Chung,* 76 Md.App. 524, 547 A.2d 654 (1988), and is relevant here:

> When a victim dies because of the tortious conduct of someone else, two entirely different types of claim may arise. One is a survival action commenced or continued by the personal representative of the deceased victim, seeking recovery for the injuries suffered by the victim and prosecuted just as if the victim were still alive. It is called a "survival action" in the sense that the claim has survived the death of the claimant. The other is a wrongful death action, brought by the relatives of the victim and seeking recovery for their loss by virtue of the victim's death. A deceptive similarity inevitably results from the prominent common denominator fact that the victim has died. In other essential characteristics, however, the two types of claim are clearly distinct. The first arises from the tortious infliction of injury upon the victim; the second, only from the actual death of the victim. In the first, damages are measured in terms of *harm to the victim;* in the second, damages are measured in terms of *harm to others* from the loss of the victim. In the first, the personal representative serves as the posthumous agent of the victim; in the second, his surviving relatives do not serve as his agent at all. They act in their own behalf.
>
> In some states, the distinction between the two types of claim has been lost—or badly blurred. In Maryland, in no small measure because of the landmark opinion of Chief Judge James McSherry for the Court of Appeals in *Stewart v. United Electric Light and Power Co.,* 104 Md. 332, 65 A. 49 (1906), that distinction has been meticulously maintained.

*Id.* at 526–27, 547 A.2d 654.

The claim for pre-impact fright damages in the case before us was in the survival action, and the disputed damages were awarded in that action. The personal representative of the decedent's estate conceded that there was no evidence of conscious pain and suffering by the decedent after impact, and there was no claim for medical expenses incurred as the result of injuries received in the accident. The only damages

claimed were funeral expenses, statutorily limited to $2,000, and for pre-impact fright.

Appellants advance two theories for the proposition that there can be no recovery in any case for pre-impact fright: (1) section 7–401(x) of the Estates and Trust Article of the Maryland Code, which permits the personal representative of an estate to commence ' "a personal" action which the decedent might have commenced or prosecuted," is a statute in derogation of the common law, and the common law did not recognize a cause of action for pre-impact fright; and (2) a claim for pre-impact fright is equivalent to an action for negligent infliction of emotional distress, a cause of action not recognized in Maryland.

We reject both of those theories.

The statutory survival actions that a deceased victim of a tort might have brought and maintained had he lived is a departure from the common law rule that a tort action died with the victim of the tort. It made no change in the law with respect to what might have been recoverable damages had the victim survived, however. That there has not previously been any recovery for pre-impact fright in a survival action is not a basis for concluding that there can never be an appropriate set of facts and circumstances that would permit a tort victim to recover damages for such emotional distress. Indeed, the allowance of recovery of damages for the consequences of fright when no impact has occurred, which we shall discuss *infra*, would indicate the contrary.

The argument based on analogy of pre-impact fright to negligent infliction of emotional distress confuses the concept of allowance of damages for emotional distress as a consequence of a negligent tort with the refusal to recognize the existence of a separate tort of negligent infliction of emotional distress. When a negligent act or omission constituting a tort results in injury, the tort victim is entitled to recover damages for all of the injuries he or she sustains, including physical pain and mental anguish or suffering, which may be termed "emotional distress." If one deliberately

engages in conduct that is not otherwise tortious, with the intent to cause another to suffer extreme mental distress, and the conduct has its intended effect, an action will lie—the otherwise non-tortious conduct coupled with the intent to cause mental suffering is a separate tort known as "intentional infliction of emotional distress." Unintended emotional distress negligently inflicted by conduct not itself tortious, however, is not a recognized tort. *See Hamilton v. Ford Motor Credit Company,* 66 Md.App. 46, 61–64, 502 A.2d 1057 (1986); *Chew v. Paul D. Meyer,* 72 Md.App. 132, 139, 527 A.2d 828 (1987). In this case, the negligent conduct of Montgomery Cable in causing a traffic backup for a mile in each direction, lasting more than thirty minutes, without providing required warning to motorists, and the negligent failure of James Kirkland and James Lee to display proper lights on their truck were negligent torts causing injury. If provable injuries resulting from those negligent torts included mental anguish or emotional distress, an action to recover for such injuries would not be one for the non-existent tort of negligent infliction of emotional distress.

There are no Maryland cases involving recoverability of damages for pre-impact fright suffered by one who did not survive the impact. There are, however, cases from other jurisdictions dealing with that issue.

The case most favorable to the personal representative is an intermediate appellate court decision from Georgia. In *Monk v. Dial,* 212 Ga.App. 362, 441 S.E.2d 857 (1994), an award of damages for preimpact fright was upheld, based on evidence that the decedent motorist veered shortly before the collision, which permitted an inference that he was aware of the impending crash in which he died instantly. That inference, in turn, was held to support a further inference as to the decedent's mental state during the brief interval between his awareness of the impending crash and the fatal impact. The court ruled that under Georgia law mental pain and suffering need not follow physical injury, but cited no precedent for that conclusion. The existence of seventy-one feet of skid marks from the decedent's vehicle in this case is obviously analogous

to the evidence that the deceased motorist in *Monk v. Dial* "veered" before the collision. It leads to a rational inference that there was an awareness of the likelihood of an impending crash.

A contrary result was reached by the Supreme Court of Kansas despite similar evidence at the scene of a fatal crash. *St. Clair v. Denny*, 245 Kan. 414, 781 P.2d 1043 (1989) arose out of a highway crash in which the vehicle of a motorist who died as a result of the crash left sixty feet of "yaw" marks (marks made by front wheels turned away from impending impact, but not constituting evidence of an attempt to stop). There was no evidence of conscious pain and suffering. Referring to a prior federal district court case, *Fogarty v. Campbell, 66 Exp. Inc.* 640 F.Supp. 953 (D.Kan.1986) in which O'Connor, J. predicted that the Kansas Supreme Court would deny recovery for pre-impact emotional distress, the Supreme Court stated that it was not necessary to test Judge O'Connor's prediction because the sixty feet of yaw marks suggest that the decedent might have been aware of the possible collision a moment before the impact but do not support a finding of emotional distress.

There are several federal cases, purporting to apply state law, granting or affirming awards of damages for pre-impact fright in fatal airplane crashes. None of them cites any existing state law on the subject that would justify their conclusions.

In *Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45 (2nd Cir.1984), an award of damages for a deceased passenger's pre-impact fear was affirmed on the basis of the court's interpretation of two opinions by the Appellate Division of the New York Supreme Court. Neither of the New York cases relied upon by the federal court is directly on point. *Juiditta v. Bethlehem Steel Corp.*, 75 A.D.2d 126, 428 N.Y.S.2d 535 (1980), involved an award for post-impact pain and suffering, in which the jury was permitted to consider, along with physical pain, emotional distress, including apprehension of impending death. In *Anderson v. Rowe*, 73 A.D.2d 1030, 425

N.Y.S.2d 180 (1980), the appellate court affirmed denial of any award for conscious pain and suffering by two young girls who were killed when the airplane in which they were travelling crashed. The basis for affirmance was the lack of evidence of conscious pain and suffering; as for pre-impact fright or mental suffering, there was no evidence from which the jury might infer that the girls were aware of danger or suffered any pre-impact fright. The federal court concluded that the failure of the New York appellate court to state that no damages could ever be awarded for pre-impact fright signified that such damages would have been allowable if there had been evidence of awareness of danger.

In *Haley v. Pan American World Airways*, 746 F.2d 311 (5th Cir.1984), the federal court, purporting to apply Louisiana law of damages, concluded that it allowed recovery for a tort victim's pre-impact "fear of doom" in a fatal airplane crash. There was no Louisiana appellate decision directly on point, but there was precedent for recovery by a tort victim for pre-impact fear followed by injury—"fright during ordeal."

The federal court in *Platt v. McDonnell Douglas Corp.*, 554 F.Supp. 360 (E.D.Mich.1983), undertook to apply Michigan law in awarding damages for pre-impact fright to the surviving family of an airplane crash victim. Michigan does not authorize a survival action; in the absence of any Michigan case law, the district court concluded that such damages were awardable under the Michigan Wrongful Death Act because that statute did not preclude recovery of damages for pre-impact fright.

Purporting to follow Florida law, the federal court in *Solomon v. Warren*, 540 F.2d 777 (5th Cir.1976), affirmed an award of damages for pre-impact fright to the personal representative of a husband and wife who died when their small plane crashed into the sea. There was no indication that either decedent suffered conscious pain, but the trial judge inferred that they must have suffered excruciating mental pain, realizing that they were about to die leaving their three cherished children alone. Judge Gee, dissenting, pointed out

that Florida had always required impact in order to recover for mental distress, i.e., that "compensable pain must be caused by the physical impact." *Id.* at 96–97. Judge Gee asserted that the majority opinion, which was based on a conclusion that it made no difference whether the mental distress preceded or followed an impact, misconstrued the reasoning behind the Florida rule and created a new element of damages based on "sheer speculation." *Id.*

A federal district court judge in Delaware, applying what he believed to be Maryland law in *D'Angelo v. United States,* 456 F.Supp. 127 (D.Del.1978), aff'd, 605 F.2d 1194 (3rd Cir.1979), awarded damages including $25,000 for fright that the judge concluded a passenger in a small plane "must have" suffered over a period of several minutes before the plane crashed after it was struck by a jeep just as it was taking off at an airport in Maryland. The district court judge noted that, under Maryland law, "recovery requires that the defendant's negligence was the direct and proximate cause of the accident, that the victim lived after the accident, and that he suffered conscious pain and suffering ... [and] recovery may be had even though the period of time between the accident and the death was short." The recovery for the mental anguish that the court assumed the passenger suffered was for post-impact fright during the period between the time when the jeep hit the plane and the time the plane crashed. The Third Circuit Court of Appeals affirmed the judgment summarily, without opinion.

We do not consider any of the federal airplane crash cases to be persuasive in our analysis of Maryland law. We must look to Maryland case law on the subject of damages under analogous circumstances.

Eighty-eight years ago, in the seminal case of *Green v. T.A. Shoemaker & Co.,* 111 Md. 69, 73 A. 688 (1909), the Court of Appeals, for the first time in this State, recognized the right to recover for fright resulting in a "material physical injury," caused by a wrongful act, even though there was no evidence of "physical impact or corporal injury to the plaintiff." The

wrongful act or series of acts in that case, constituting an actionable nuisance, consisted of repeated blasting of large quantities of rocks by explosives during construction work on a railroad line about two hundred yards from the plaintiff's dwelling. The blasting shook the house and caused plaster to fall and the explosives hurled large rocks that crashed through walls, ceilings, windows, and doors. The plaintiff and others in the house were in constant fear of being killed. The plaintiff testified that her "nerves were completely broken down by fright and [she] was not able to do [her] work." She further testified that before the blasting started she was in ordinary health and never was nervous. "Since then," she said, "I have had no health at all." Her family physician testified that after the blasting began the plaintiff developed "nervous prostration" which he attributed to the shock of the blasting.

The Court, noting that there was "a wide divergence of judicial opinion as to whether a cause of action will lie for actual physical injuries resulting from fright and nervous shock caused by the wrongful acts of another," stated that "it may be considered as settled, that *mere fright, without any physical injury resulting therefrom,* cannot form the basis of a cause of action." *Id.* at 77, 73 A. 688. (Emphasis in original.) "This is so," the Court explained, "because mere fright is easily simulated, and because there is no practical standard for measuring the suffering occasioned thereby, or of testing the truth of the claims of the person as to the results of the fright. But when it is shown that a *material physical injury* has resulted from fright caused by a wrongful act, and especially, as in this case, from a constant repetition of wrongful acts, in their nature calculated to cause constant alarm and terror, it is difficult, if not impossible, to perceive any sound reason for denying a right of action in law, for such physical injury." *Id.* (Emphasis in original.)

The Court in *Green v. Shoemaker* further observed that courts that had denied recovery for physical injuries caused by fright did so upon two-fold grounds: "'1st, that physical injury produced by mere fright caused by a wrongful act, is

not the proximate result of the act; and 2nd, that upon the ground of expediency, the right should be denied, because of the danger of opening the door to fictitious litigation, and the impossibility of estimating damages.' *Huston v. Freemansburg*, 3 L.R.A. New Series, page 50, Editor's note." The Court rejected the first of those grounds on the basis of its earlier holding in *Baltimore City Passenger Railway Co. v. Kemp*, 61 Md. 74, 80–81 (1883), in which it said:

It is not simply because the relation of cause and effect may be somewhat involved in obscurity, and therefore difficult to trace, that the principle obtains that only the natural and *proximate* results of a wrongful act are to be regarded. *It is only where there may be a more direct and immediate sufficient cause of the effect complained of, that the more remote cause will not be charged with the effect.* If a given effect can be directly traced to a particular case, as the natural and proximate effect, why should not such effect be regarded by the law, even though such cause may not always, and under all conditions of things, produce like results? It is the common observation of all, that the effects of personal physical injuries depend much upon the peculiar conditions and tendencies of the person injured; and what may produce but slight and comparatively uninjurious consequences in one case, may produce consequences of the most serious and distressing character in another. * * * Hence, the general rule is, in actions of tort like the present, that the wrongdoer is liable for all the direct injury resulting from his wrongful act, and that too, although the extent or special nature of the resulting injury could not, with certainty, have been foreseen or contemplated as the probable result of the act done.

*Green v. Shoemaker*, 111 Md. at 77–78, 73 A. 688 (emphasis in original).

Addressing the question of "expediency," i.e., the "danger of opening the door to fictitious litigation," as a reason for denying recovery for physical injuries resulting from fright caused by tortious conduct, the Court stated:

The argument from mere expediency cannot commend itself to a Court of justice, resulting in the denial of a logical legal right and remedy in *all cases,* because in *some* a fictitious injury may be urged as a real one. The *apparent* strength of the theory of expediency lies in the fact that nervous disturbances and injuries are sometimes more imaginary than real, and are sometimes feigned, but this reasoning loses sight of the equally obvious fact that a nervous injury arising from actual physical impact is as likely to be imagined as one resulting from fright without physical impact, and that the former is as capable of simulation as the latter.

It must be conceded that the numerical weight of authority supports the general rule that there can be no recovery for nervous affections unaccompanied by contemporaneous physical injury, but the sounder view, in our opinion, is that there are exceptions to this rule, and that where the wrongful act complained of is the proximate cause of the injury, within the principles announced in *Kemp's Case, supra,* and where the injury ought, in the light of all the circumstances, to have been contemplated as a natural and probable consequence thereof, the case falls within the exception and should be left to the jury.

*Id.* at 81, 73 A. 688 (emphasis in original).

The Court of Appeals has continued to apply the principles and follow the reasoning of *Green v. Shoemaker.* In *Bowman v. Williams,* 164 Md. 397, 165 A. 182 (1933), there was evidence to the effect that the plaintiff, who saw a coal truck crash into the basement of his house, was so affected with fright and alarm for the safety of his children who were in the basement that he suffered a severe shock to his nervous system, as a result of which he could not work for six months. The Court held that the evidence was sufficient to support an award of damages, stating, at 404:

In Maryland, the decision in *Green v. T.A. Shoemaker & Co.,* 111 Md. 69, 76–83, 73 A. 688, and followed in *Baltimore & O.R. Co. v. Harris,* 121 Md. 254, 268–270, 88 A. 282; *Patapsco Loan Co. v. Hobbs,* 129 Md. 9, 16, 98 A. 239, and *Great Atlantic and Pacific Tea Co. v. Roch,* 160 Md. 189,

153 A. 22, have settled the principle that a plaintiff can sustain an action for damages for nervous shock or injury caused, without physical impact, by fright arising directly from defendant's negligent act or omission, and resulting in some clearly apparent and substantial physical injury, as manifested by an external condition or by symptoms clearly indicative of a resultant pathological, physiological, or mental state.

In *Vance v. Vance,* 286 Md. 490, 408 A.2d 728 (1979), the Court held that, despite the absence of medical testimony, the evidence supported an award of damages for emotional distress suffered by the plaintiff, Muriel Vance, as a result of negligent misrepresentation by Dr. Arnold Vance that he was divorced at the time he and Muriel participated in a religious marriage ceremony. The plaintiff's son testified that after his mother discovered that her marriage of eighteen years was a nullity, her appearance "changed from that of a woman of beauty to a person who looked 'a wreck,' with unkempt hair, sunken cheeks, and dark eyes." Her son stated that he has great difficulty in communicating with her, that she was detached, unaware of her own presence, and spent long periods of time crying and sobbing. Following the rule in *Green v. Shoemaker* and *Bowman v. Williams* recognizing that an action may be maintained for mental distress when such distress results in "material physical injury," the Court held that the term "physical" was not used in the ordinary dictionary sense, but was "used to represent that the injury for which recovery is sought is capable of objective determination."

*Faya v. Alvaraz,* 329 Md. 435, 620 A.2d 327 (1993), began with two separate actions by female patients who alleged that they suffered fear of acquiring the AIDS virus from the surgeon who operated on them without disclosing that he was HIV positive. Both alleged that their fear and mental distress upon learning that the surgeon had AIDS was accompanied by headaches and sleeplessness, and they had to endure the physical and financial sting of blood tests for the AIDS virus. Citing *Green v. Shoemaker* and cases that had followed and

expanded upon it, including *Bowman v. Williams* and *Vance v. Vance*, the Court held that the plaintiffs may recover for those injuries "to the extent that they can objectively demonstrate their existence." 329 Md. at 459, 620 A.2d 327.

*Belcher v. T. Rowe Price*, 329 Md. 709, 621 A.2d 872 (1993), was a workers' compensation case. Mrs. Belcher, an employee of T. Rowe Price, was at her desk, working, when a three-ton beam being hoisted by a construction crane during the erection of a building next door broke loose without warning and crashed through the concrete roof over Mrs. Belcher's head, landing five feet from her. Although she sustained no bodily injury directly from the impact, she suffered severe mental and emotional distress that resulted in sleep disturbances, nightmares, heart palpitations, chest pain, and headaches. The issue before the Court was whether Mrs. Belcher had sustained a compensable accidental injury. Since the Workers' Compensation Act did not define "injury" in terms of physical or mental trauma, the Court turned to tort cases for guidance. Citing and quoting extensively from *Green v. Shoemaker* and the cases that followed it, particularly *Bowman v. Williams* and *Vance v. Vance*, which refined the meaning of "material physical injury" resulting from fright or emotional distress that would support a cause of action, the Court ruled that "an injury under the Act may be psychological in nature if the mental state for which recovery is sought is capable of objective determination."

Finally, in *Dobbins v. Washington Suburban Sanitary Commission*, 338 Md. 341, 658 A.2d 675 (1995), the Court of Appeals was presented with an issue of whether recovery could be had for emotional distress resulting in alleged physical problems caused by negligent release of a large amount of water that greatly damaged the plaintiffs' home. The Court, reviewing the line of cases from *Green v. Shoemaker* to *Belcher v. T. Rowe Price*, said:

> We have advanced two separate theories under which we have limited recovery for emotional distress. First, motivated by a concern over feigned claims, we adopted the so called "physical impact" rule and later the "physical injury"

rule. Under the "physical impact" rule, which we followed in Maryland until our decision in *Green v. T.A. Shoemaker & Co.*, 111 Md. 69, 73 A. 688 (1909), a plaintiff could not recover for emotional distress unless "there was physical impact upon the plaintiff coincident in time and place with the occasion producing the mental distress." *See Vance v. Vance*, 286 Md. 490, 496–97, 408 A.2d 728 (1979). When we rejected the "physical impact" rule in *Green*, we adopted the "physical injury" rule, which "permitted recovery for negligent infliction of mental distress if a 'physical injury' results from the commission of a tort, regardless of impact." *See Vance, supra*, 286 Md. at 497, 408 A.2d 728. Then, in *Bowman v. Williams*, 164 Md. 397, 165 A. 182 (1933), we said that physical injury could be "manifested by an external condition or by symptoms clearly indicative of a resultant pathological, physiological, or mental state." *Id.* at 404, 165 A. 182. Later, in *Vance, supra*, we stated:

"We think it clear that *Bowman* provides that the requisite 'physical injury' resulting from emotional distress may be proved in one of four ways. It appears that these alternatives were formulated with the overall purpose in mind of requiring objective evidence to guard against feigned claims. The first three categories pertain to manifestations of a physical injury through evidence of an external condition or by symptoms of a pathological or physiological state. Proof of 'physical injury' is also permitted by evidence indicative of a 'mental state,'....

In the context of the *Bowman* rule, therefore, the term 'physical' is not used in its ordinary dictionary sense. Instead, it is used to represent that the injury for which recovery is sought is capable of objective determination."

*Id.* at 500, 408 A.2d 728.

In *Belcher, supra*, we noted that the "physical injury" rule had dispelled "the fear that the right to damages for emotional distress would open the floodgates to feigned claims." *Id.* at 734, 621 A.2d 872. We further stated: "*Vance* adequately answered the troubling basic policy issues surrounding the definition of the limits of liability for

negligently inflicted emotional harm by requiring that such harm be capable of objective determination. Such an objective determination provides reasonable assurance that the claim is not spurious." *Id.* at 735, 621 A.2d 872.

A second and separately viable theory under which we have limited recovery for emotional injuries is based on the rules concerning foreseeability of harm, which courts have used both "in determining the existence of a duty owed to the Plaintiff [and] in resolving the issue of proximate cause." *Henley v. Prince George's County,* 305 Md. 320, 333, 503 A.2d 1333 (1986). We have explained that the foreseeability rules exist "to avoid liability for unreasonably remote consequences." *Id.* at 333, 503 A.2d 1333. Further, we have stated:

"In applying the test of foreseeability ... it is well to keep in mind that it is simply intended to reflect current societal standards with respect to an acceptable nexus between the negligent act and the ensuing harm, and to avoid the attachment of liability where, in the language of Section 435(2) of the *Restatement (Second) of Torts* (1965), it appears 'highly extraordinary' that the negligent conduct should have brought about the harm."

*Id.* at 334, 503 A.2d 1333.

In this context, we have distinguished the duty inquiry from the proximate cause inquiry. In *Henley, supra,* 305 Md. at 336, 503 A.2d 1333, we said: "Foreseeability as a factor in the determination of the existence of a duty involves a prospective consideration of the facts existing at the time of the negligent conduct. Foreseeability as an element of proximate cause permits a retrospective consideration of the total facts of the occurrence...." *See also Stone v. Chicago Title Ins.,* 330 Md. 329, 338, 624 A.2d 496 (quoting *Henley*).

*Dobbins,* 338 Md. at 347–348, 658 A.2d 675.

It was on the basis of lack of foreseeability, rather than any retreat from the holdings and reasoning of *Green v. Shoemaker, Bowman v. Williams, Vance v. Vance,* and *Belcher v. T.*

*Rowe Price,* that the Court held that the Dobbinses could not recover for the emotional distress resulting from the Sanitary Commission's negligent discharge of water, even if the emotional distress resulted in physical problems that would have satisfied the test of "pathological, physiological, or mental state" referred to in *Bowman* or injury "capable of objective determination" as described in *Vance.*

The Dobbinses pointed to the following language in *Belcher* as a basis for abandoning the rule adopted by the Court in *State v. Baltimore Transit Co.,* 197 Md. 528, 539, 80 A.2d 13 (1951) that "[u]nder ordinary circumstances there can be no recovery for mental anguish suffered by plaintiff in connection with an injury to his property.":

> "We have traced the development of the law of Maryland as interpreted in our judicial opinions concerned with liability for negligently inflicted mental harm, from a standard limiting such liability to purely physical trauma to a standard permitting recovery for damages for trauma resulting from purely emotional distress that can be objectively determined. The recognition that a person should be compensated for mental harm resulting from the negligent act of another is in accord with the ever increasing knowledge in the specialties which have evolved in the field of medicine and in the disciplines of psychiatry and psychology. Persons suffering from severe mental distress are no longer simply warehoused in Bedlam type institutions; they are treated by medical experts at no small cost. We are now aware that mental injuries can be as real as broken bones and may result in even greater disabilities."

To that argument the Court replied:

> Clearly, however, these comments referred only to the trend toward liberalizing the "physical injury" rule. We did not in any way signal relaxation of the foreseeability rules relating to duty and proximate cause, which formed the basis of the *Baltimore Transit* rule. Indeed, we reaffirm the conclusions reached in *Baltimore Transit* that (1) ordinarily, emotional injuries are not the consequences that

ensue in the ordinary and natural course of events' from negligently inflicted property damage and (2) such injuries should not be contemplated, in light of all the circumstances, "as a natural and probable consequence" of a negligently inflicted injury to property.

■ From the cases cited above, we conclude that there can be no award of damages for pre-impact fright suffered by a tort victim who died instantly upon impact or who never regained consciousness after the impact, because no cause of action will lie for "mere fright" without physical injury (*Green v. Shoemaker*) or injury capable of objective determination (*Vance*) resulting therefrom. Obviously, one who died instantly upon impact or at least died without recovering consciousness following impact cannot have suffered any injury capable of objective determination *as a result of* pre-impact fright," i.e., fear, terror, or mental anguish or distress from anticipation of imminent injury or death.

■ If the reluctance to award damages for "mere fright" stemmed from concern about the "danger of opening the door to fictitious litigation," or "expediency," referred to in *Green v. Shoemaker*, 111 Md. at 77–81, 73 A. 688, the fact that there was an impact *after* the tort victim experienced the fright might tend to alleviate that concern. But the Court of Appeals in *Green v. Shoemaker* expressly excluded "expediency" as a basis for denying recovery of damages for fright. *Id.* The Court of Appeals stated unequivocally in *Green v. Shoemaker* and has since repeatedly reaffirmed that, to be compensable, fear suffered by a tort victim must result in an injury capable of being determined by objective signs or symptoms. When, as in this case, the tort victim dies instantly or, at least without regaining consciousness, from the impact, there is no evidence of injury resulting from fright. Indeed, although there is a reasonable inference in this case, from the existence of skid marks, that the deceased may have experienced some mental distress upon realizing his peril, the extent of that distress and its consequences is a matter of sheer speculation, there being, in the language employed by

the Court of Appeals, "no practical standard for measuring the suffering occasioned by" that mental distress. *Green v. Shoemaker,* 111 Md. at 77, 73 A. 688.

It should be recognized that pre-impact fright, mental distress caused by expectation or anticipation of impending doom, is an entirely different phenomenon from post-impact mental suffering or emotional distress. The latter results from and exacerbates bodily injuries sustained upon impact, e.g., concern about the extent of recovery and the length of the recovery period; worry over the effect of the injuries and the duration of the recovery period on the victim's finances; and, if there is not a complete recovery, the loss of happiness or enjoyment of life suffered by one who has been rendered unable to do at all or do with the same degree of facility those things that formerly produced pleasure. All of those forms of mental distress are as much the natural, proximate, and foreseeable result of tortious conduct as bodily injury and physical pain. Pre-impact fright engendered by recognition of danger, however, does not result from bodily injuries and is compensable only to the extent that it causes or results in demonstrable or objectively determinable injury.

## III.

The jury awarded economic damages of $212,000.00 to Mr. Beynon and $165,000.00 to Mrs. Beynon. We agree with appellants' contention that the judgments for pecuniary or economic damages cannot be sustained.

Maryland's wrongful death statute, Md.Code (1974, 1995 Repl.Vol., 1996 Supp.) § 3–901, *et seq.,* of the Courts and Judicial Proceedings Article provides in pertinent part:

**§ 3–904. Action for wrongful death.**

 \* \* \* \* \* \*

(e) *Damages if unmarried child, who is not a minor, dies.*—For the death of an unmarried child, who is not a minor child, the damages awarded under subsection (c) are not limited or restricted by the "pecuniary loss" or "pecuniary benefit" rule but may include damages for mental

anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, care, attention, advice, counsel, training, or guidance where applicable if:

(1) The child is 21 years or younger; or

(2) A parent contributed to more than 50 percent or more of the child's support.

On the date of the accident, the decedent was approximately nineteen and one half years old. He held a full-time job as a parts delivery person, was living in his parents' home, and had been paying them $150.00 in monthly rent. In addition to his full-time job, the decedent performed various household services for his parents, e.g., lawn maintenance, auto repair, etc. During the direct examination of the decedent's father, the jury heard the following testimony:

[COUNSEL FOR APPELLANTS]: Did your son make contributions around the home?

[MR. BEYNON]: Yes, he did.

[COUNSEL FOR APPELLANTS]: Can you tell us about those?

[MR. BEYNON]: We—we had tried to instill a sense of responsibility in him. We had required that he pay us $150 a month for rent. He did various—just about anything I asked him around the house, routine; whether it was grass cutting, working on the automobiles. He also worked with me, helped me out on occasion install kitchens and baths and do all of the various trades that were a part of that, and he would help me out on occasion with that, too.

[COUNSEL FOR APPELLANTS]: You said your son was required to pay $150 for his room. Did he in fact pay those fees?

[MR. BEYNON]: Yes, he did.

\* \* \* \* \* \*

[COUNSEL FOR APPELLEES]: What type of work did your son do, when you intended for your son to work with you?

[MR. BEYNON]: ... [H]e was supposed to start working with me right after he got out of high school. He was supposed to start. And I had mixed feelings about it. I wanted him to work with me, but yet I didn't want him to be in this work 20 years down the road. . . .

[COUNSEL FOR APPELLEES]: Did there come a time at all that you found out your son's ideas about working with you?

[MR. BEYNON]: Yes. After he passed away, [we] were going through his belongings and we found a letter that he had written to a friend back in West Virginia. And I didn't realize it—I didn't realize it at the time until we read that letter ... and in it he had stated he was going to start working with me. And by the way everything was worded in it, he was really looking forward to it.

■ The evidence showed that the decedent's payment of rent amounted to $150.00 per month. No evidence was presented to show that the decedent planned to live in his parents' home indefinitely. Douglas Beynon, Sr. was self-employed in the contracting business at the time of his son's death. Mr. Beynon did testify that his son planned to work for the family business in the future, but no evidence was presented as to how much the decedent would earn or what portion of his earnings he would contribute to his parents. That the decedent had been paying his parents $150.00 per month in rent, and had been occasionally helping out with household chores, is insufficient to support either award of pecuniary damages.

We note that, prior to instructing the jury, the trial judge examined the proposed verdict sheet with counsel:

[THE COURT]: ... I mean, at best, it seems to me that the economic benefit that—the evidence has been $150.00 a month, I mean, you know, and it is going to be minimal at best anyway, but this case is all about past and future mental pain and suffering.

We agree with that evaluation; the appropriate focus of the parents' damage claim was past and future mental pain and

suffering, not economic damages. Therefore, we vacate the award of economic damages.

## IV. & V.

To recover for negligence, a plaintiff must prove the existence of four elements: a duty owed to him, a breach of that duty, a causal connection between the breach and the injury, and damages.

*Southland Corp. v. Griffith*, 332 Md. 704, 712, 633 A.2d 84 (1993) (citations omitted).

### A. Duty

■ Montgomery Cable initially argues that it owed no duty to the decedent because the State Police were **solely** responsible for stopping traffic. That assertion ignores Montgomery Cable's explicit duty to warn oncoming motorists that the road ahead had been closed.

Section 8–204 of the Transportation Article provides that the State Highway Administration ("SHA") is the governmental entity charged with maintaining all State highways. Md. Code (1977, 1993 Repl.Vol., 1996 Supp.), § 8–204(c) of the Transportation Article (Transp.). In accordance with its authority, the SHA may issue permits allowing certain organizations, i.e., utilities, to enter or obstruct a State Highway for certain specific purposes. Transp. § 8–646(a). In 1990, Montgomery Cable was issued such a permit. That permit, however, was conditioned on the observance of certain basic safety procedures.

Subsection (3) of the permit, entitled "traffic control," provided that "[l]ights, signs, barricades, etc., shall be maintained by the Permittee [Montgomery Cable]" as per Federal Highway Administration and SHA requirements. SHA traffic control standards in place in 1990 required that road closure signs be placed intermittently, beginning at a point no closer than two miles from the designated repair site. In addition, SHA standards required the use of flag persons and flashing lights to warn oncoming motorists, and that traffic be periodi-

cally "ventilated" to prevent too long a backup. The jury was entitled to find that the specific conditions set forth in the permit explicitly imposed on Montgomery Cable a duty to the decedent at the time and location of the accident.

Montgomery Cable also contends that it had assigned its duty to the State Police. There is no merit in that contention. The State Police merely *stopped* traffic at the crossing site; it never undertook the responsibility to post lights, signs, markers, barriers, or other warning devices. Montgomery Cable remained responsible for alerting motorists approaching the backup.

## B. Breach

■ The jurors were entitled to conclude that Montgomery Cable had breached its duty to the decedent by (1) failing to erect the warning devices called for in the permit, (2) assigning employees to the job site who were unfamiliar with SHA safety requirements, and (3) informing the State Police that the repairs would take only five to ten minutes.

Montgomery Cable concedes that it did not place any warning signs, lights, or markers of any sort along the roadway approaching the repair location. It simply contacted the State Police and requested that they stop traffic. Montgomery Cable employees testified that they were unfamiliar with SHA safety requirements. The following transpired during the testimony of Montgomery Cable's Director of Construction, Dennis Setting:

[COUNSEL FOR APPELLEES]: Whenever an emergency crew established a road closure on behalf of Cable TV Montgomery, if no State Police were present then Cable TV Montgomery would be responsible for controlling traffic and posting traffic control devices, is that correct?

. . .

[SETTING]: Sure.

[COUNSEL FOR APPELLEES]: But if the State Police showed up or were called in, then the emergency crew in

the eye of Cable TV Montgomery didn't have to be concerned with the traffic control, is that right?

[SETTING]: Well, I wouldn't say not concerned, but you—the State Police took over.

[COUNSEL FOR APPELLEES]: Cable TV [Montgomery] would look to the State Police to handle the traffic control, is that right?

[SETTING]: Yes.

[COUNSEL FOR APPELLEES]: And you don't know of any documents that set forth this practice, if you will, on behalf of Cable TV Montgomery do you?

[SETTING]: No, sir.

[COUNSEL FOR APPELLEES]: You don't know of any rules or regulations or procedure manuals from any governmental agency that said anything about such a practice around June of 1990, do you?

[SETTING]: No, sir, I don't.

The repairs actually took thirty to forty-five minutes. A Montgomery Cable employee informed the State Police Officers at the construction site that the necessary repairs would only warrant a five to ten minute highway closure. It is understandable that a person would have difficulty estimating how long the repairs would actually take. It is inexcusable, however, to ignore SHA requirements on the basis of such an estimate.

## C. Proximate Cause

 Montgomery Cable argues that, even if it did breach a duty to the decedent, any such breach could not have been the proximate cause of the accident because of two separate, intervening acts of negligence: (1) the State Police Officers' failure to stop traffic properly, and (2) the failure of Kirkland and Lee to provide for adequate lighting on the rear of their trailer.

It is generally held that negligence is the proximate cause of an injury when the injury is the natural and probable result or consequence of the negligent act or omission. The test is

whether the injury sustained was that which was reasonably foreseeable, in light of the surrounding circumstances. It is equally correct, however, that proximate cause must be decided in a common-sense fashion in light of the attendant facts and circumstances, and, unless the facts are undisputed and admit of but one inference, the question is for the jury.

*Medina v. Meilhammer,* 62 Md.App. 239, 247, 489 A.2d 35, *cert. denied,* 303 Md. 683, 496 A.2d 683 (1985) (citations and internal quotations omitted); *See also Bloom v. Good Humor Ice Cream Co.,* 179 Md. 384, 18 A.2d 592 (1941).

Montgomery Cable never told the State Police that it would be necessary to stop traffic for up to forty-five minutes. As the decedent approached the accident scene, no warning signs alerted him to the fact that traffic had been completely stopped. Gershon Alexander, an expert testifying for appellees, explained:

Looking at the situation here, as young Mr. Beynon comes around the Beltway ... he has no information related to the blockage of the freeway....

And so we don't expect, drivers don't expect freeways to be blocked....

And ... what we do expect is that when something like that will occur that we expect to be notified enough in advance so we can take effective action; either get off the highway and take another route, or start looking for a backup, or the like.

So the condition of the highway was a surprise to Mr. Beynon, would be a surprise to anyone, and the lack of information made it even more of a surprise because then he was put in a position of having to detect and recognize a situation for which he was essentially not prepared.

. . .

... drivers are owed an obligation by the people who are working on or adjacent to the highway to give them the information they need to avoid accidents.

. . .

My opinion is that the lack of appropriate advance warning played a role in the perception reaction time of Mr. Beynon and, therefore, played a role in the causation of the accident.

The evidence was more than sufficient to persuade the jury that the accident in question was the natural and probable result of Montgomery Cable's failure to do what it was obligated to do on the occasion at issue.

■■■■■ There is also no merit in Montgomery Cable's argument that it is relieved of liability because others committed intervening acts of negligence. In order for an intervening cause to relieve a defendant of liability, the subsequent cause must "so entirely supersede[ ] the operation of the defendant's negligence [so] that it alone, without his negligence contributing thereto in the slightest degree, ·produces the injury." *Palms v. Shell Oil Co.*, 24 Md.App. 540, 544, 332 A.2d 300 (1975) (citation omitted). In this case, Montgomery Cable had an express duty to act (place warning lights or signs, use flag persons, etc.), in order to warn approaching motorists of the road closure. It is obvious that such duty was not confined to the point where the two State Police Officers brought traffic to a halt. Rather, Montgomery Cable's duty to oncoming traffic extended to motorists approaching the location where the decedent struck the rear of the Kirkland vehicle. Under these circumstances, any negligent actions of the State Police or Kirkland and Lee were concurrent, not superseding, causes of the accident.[3]

---

**3.** It is well settled that contemporaneously negligent parties can be found liable for the cumulative harm that results. *See Yellow Cab Co. v. Bonds*, 245 Md. 86, 225 A.2d 41 (1966). As we stated in *Hartford Ins. Co. v. Manor Inn*, 335 Md. 135, 642 A.2d 219 (1994),

> [t]he defendant is liable where the intervening causes, acts, or conditions were set in motion by his earlier negligence, or naturally induced by such wrongful act, or omission, or ... if the intervening acts or conditions were of a nature, the happening of which was reasonably to have been anticipated....

*Id.* at 158, 642 A.2d 219 (quoting *Pennsylvania Steel Co. v. Wilkinson*, 107 Md. 574, 581, 69 A. 412 (1908)); *see also Little v. Woodall*, 244 Md. 620, 224 A.2d 852 (1966) (if negligent act increases the risk of damage

The issue of Montgomery Cable's primary negligence was properly submitted to the jury, and the jury's finding is amply supported by the evidence.

## VI.

Montgomery Cable argues that the trial judge committed reversible error when he instructed the jury on (1) sudden emergency, (2) the responsibility of the State Police, and (3) presumptions regarding the decedent's conduct. We are not persuaded that any error occurred.

### A. Sudden Emergency

 The court gave the following "sudden emergency" instruction:

When the driver of a motor vehicle is faced with a sudden and real emergency which was not created by the driver's own conduct, the driver must exercise reasonable care for his or her own safety and for the safety of others.

. . .

The driver is not to be held to the same coolness or accuracy of judgment which is required of a person who has an ample opportunity to fully exercise personal judgment.

Montgomery Cable contends that this instruction should not have been given because there "was no evidence that the decedent was faced with any emergency (other than the one he himself created)." There is no merit in that contention.

The jury heard testimony that the decedent was confronted with a poorly illuminated vehicle stopped in the middle of Interstate 495 at a point where no signs had been posted to alert oncoming motorists about the road closure. The jury was entitled to find that the decedent was thereby confronted with an unusual condition requiring a sudden response. *See Ryan v. Thurston*, 276 Md. 390, 347 A.2d 834 (1975); *Warnke v. Essex*, 217 Md. 183, 141 A.2d 728 (1958) ("[w]hether the

---

"through the operation of another reasonably foreseeable force," defendant is still liable).

operator of an automobile was confronted with an emergency, and whether he acted negligently under the circumstances, are generally questions for the jury"). The "sudden emergency" instruction, therefore, was appropriate and legally correct.

### B. State Police Responsibility

Montgomery Cable also finds fault with the court's refusal to instruct the jury that the State Police had the authority to, and did in fact, stop *and* control traffic at the time of the accident.

While it is true that the State Police did *stop* traffic on the occasion at issue, the jury was entitled to conclude that Montgomery Cable had an independent duty to warn approaching motorists of the fact that traffic had been stopped. Because the proposed instruction was at odds with the evidence presented regarding the existence of that independent duty, Montgomery Cable was not entitled to the requested instruction.

### C. Contributory Negligence Presumptions

Montgomery Cable argues that the court should not have instructed the jury that "[t]here is a presumption that Douglas Beynon, Jr. exercised due care for his own safety[,]" in light of what Montgomery Cable views as overwhelming evidence of the decedent's own contributory negligence.

We agree with Montgomery Cable that if contributory negligence has been established as a matter of law no "due care" presumption is applicable. As we discussed previously, however, the decedent's contributory negligence was a question for the jury.

Addressing the "due care" presumption, the Court of Appeals said:

We begin with recognizing the presumption of due care existing in favor of the deceased. If there is countervailing evidence that is so slight as to be insufficient to be considered by the jury in rebuttal of the presumption, the court should grant an instruction giving full benefit of the pre-

sumption of due care to the plaintiff. On the other hand, the countervailing evidence may be so conclusive that it shifts the burden or duty of going forward with the evidence back to the plaintiff, in which event the defendant would be entitled to a directed verdict, if the plaintiff does not produce evidence in reply, unless there is already evidence in the case tending to contradict the defendant's evidence. Again, *there may be times when the evidence may fall between the two categories mentioned above, in which event the issue of due care should be submitted to the jury.* Bratton v. Smith, 256 Md. 695, 703, 261 A.2d 777 (1970) (emphasis supplied). In this case, the evidence of the decedent's contributory negligence fell somewhere in between those two extremes and, therefore, the instruction was properly given.

## VII.

Lumbermens argues that the court erred in refusing to allow its expert witness to testify regarding certain photographs of the accident scene. Harry Kriemelmeyer, a registered professional engineer, was qualified as an expert in accident reconstruction. During his testimony, counsel for Lumbermens asked him to interpret several photographs of the accident scene taken by the Maryland State Police. After Mr. Kriemelmeyer expressed difficulty in distinguishing lights from flashbulb glare in certain photographs, appellees' counsel moved to strike his testimony. The following transpired when the court questioned Mr. Kriemelmeyer about his expertise in the area of photography:

[THE COURT]: Tell me, sir. Is your opinion with regard to this based upon anything you can point to in terms [of] your work history and the use of photographs and the like?

[KRIEMELMEYER]: I have used photographs in probably half of the reconstruction engineering I have done.

[THE COURT]: I am sure you have. I know. But I am talking about this is something that is a little more finite

than that. We are talking now about taking photographs at night of lights which are on or off, as the case may be.

Can you point to anything in your history as far as your training in this area that would put you in a category of having more knowledge of this than I, walking up and looking at it. I can tell you I have no knowledge of it.

What would make you more able than I to tell these people over here what your opinion is as to what that is?

[KRIEMELMEYER]: I have had no classes in such topics. I have used photography. I have used nighttime photography in night vision situations. I have studied reflectors, I have studied a number of trailer underride accidents using nighttime photography. If there are small yellow lights on the side, what they would look like from up the road, et cetera. I have taken pictures of trucks, lights on, lights off, using flash at night and I have been there.

The court then allowed appellees' counsel to voir dire Mr. Kriemelmeyer, and the following exchange ensued:

[COUNSEL FOR APPELLEES]: We don't dispute your ability to use photographs for the court that you are doing as an accident reconstructionist, but tell me isn't it a fact that you don't have any experience as a forensic photographer?

[KRIEMELMEYER]: I think you are on a term I don't equate with. I have used pictures for forensic study and evidence in many, many cases. Because often, that is all you have.

\* \* \* \* \* \*

[COUNSEL FOR APPELLEES]: In your curriculum vita, you have at no point indicated that you are [an] expert in photographic examination, is that correct?

[KRIEMELMEYER]: No. That is correct.

The court then announced the following ruling:

[THE COURT]: The motion is granted. I am going to disallow any further elaboration on either of these two photographs[.] I am going to strike from the record what

has been rendered thus far with regard to these photographs along this particular line.

\* \* \* \* \* \*

Let the record be clear on this. This is a rather critical, absolutely critical point in this case with regard to whether or not those lights were on.

\* \* \* \* \* \*

But the reason why I disallowed the testimony was because this guy is apparently going to come in with no background at all in analysis of photographs, and look at the photographs and say, eureka, they are on. I mean, it is startling on a critical portion of this.... And he clearly cannot, and I will not allow him to make analyses from these photographs with regard to whether or not these lights were on or off.

In *Winkler v. State,* 40 Md.App. 616, 622, 392 A.2d 1173 (1978), we stated:

"[T]he admissibility of expert testimony is a matter largely within the discretion of the trial court and its action will seldom constitute a ground for reversal," notwithstanding that "the trial court's determination is reviewable on appeal ... and may be reversed if it is founded on an error of law or some serious mistake, or if the trial court clearly abused its discretion."

*See also Radman v. Harold,* 279 Md. 167, 367 A.2d 472 (1977). In this case, Mr. Kriemelmeyer conceded that he could not differentiate between lights on the back of the Kirkland truck and glare caused by the flashbulb of the camera. Moreover, he had no special training in photographic analysis or photography. We agree with the trial judge that Mr. Kriemelmeyer's training and work experience did not qualify him to testify as an expert in the field of photography. There was no abuse of discretion in granting appellees' motion to strike Mr. Kriemelmeyer's opinion on the issue of whether the photographs showed that the lights of the Kirkland vehicle "were on or off."

## VIII.

At the time of his death, the decedent was driving a vehicle owned by his employer, registered in the state of Virginia, and insured under a Lumbermens policy. When Lumbermens moved for judgment on its cross-claims at the close of evidence, the court "reserved" ruling on the motion, stating:

> It presents the trial court with a real quandary. There is no question but that there is not any evidence of insurance or amounts of insurance involved in the case, and then, of course, you renewed your motion to get out of the case, Lumbermens and State Farm, and the temptation, of course, is there to allow you to get out of the case at this juncture, but then that could create ... and this is all under Virginia law—as I understand the scenario here, if the jury brings back a verdict of any proportion whatever against the two individuals, then the plaintiffs will be seeking reimbursement for that amount from these two defendants.
>
> \* \* \* \* \* \*
>
> It is my firm belief, however, that if I were to let you jump off the bandwagon now that it would only gum up the whole procedure, and I am going to keep you in, but I still have an ace in the hole.
>
> I still have my ruling on the motion depending on what the jury does; okay?

After the jury rendered its verdict, Lumbermens again moved for judgment on the cross-claims it had filed against James Kirkland and James Lee, the owner and driver of the truck involved in the accident with the decedent. The court "ordered that [the] cross-claims be dismissed without prejudice as moot." Lumbermens now argues that it is entitled to judgment on its cross-claims against James Kirkland and James Lee. We disagree.

 Maryland Rule 2–503(b) vests the trial court with wide discretion to order a separate trial for any claim, cross-claim, counterclaim, or third party claim in furtherance of convenience or to avoid prejudice. The appellate court "must

first determine whether the court's decision served the purpose of Rule 2–503(b) and whether appellants suffered any unfair prejudice as a result of that decision." *Myers v. Celotex Corp.*, 88 Md.App. 442, 449, 594 A.2d 1248 (1991), *cert. denied*, 325 Md. 249, 600 A.2d 418 (1992). In this case, the trial judge recognized that entering judgment on the cross-claims prior to jury deliberations would potentially complicate the litigation. In "furtherance of convenience," he reserved ruling on Lumbermens' motions until after the verdict was returned. After the verdict was reached by the jury, he dismissed the cross-claims "without prejudice." We are not persuaded that appellants were unfairly prejudiced by that exercise of discretion.

**JUDGMENT IN FAVOR OF JULIA D. BEYNON AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DOUGLAS K. BEYNON, JR. VACATED AS TO AWARD OF DAMAGES FOR PRE–IMPACT FRIGHT AND AFFIRMED AS TO AWARD OF DAMAGES FOR FUNERAL EXPENSES.**

**JUDGMENTS IN FAVOR OF JULIA D. BEYNON AND DOUGLAS K. BEYNON, SR., VACATED AS TO AWARDS OF DAMAGES FOR ECONOMIC LOSSES AND AFFIRMED AS TO AWARDS OF DAMAGES FOR PAST AND FUTURE MENTAL PAIN AND SUFFERING.**

**COSTS TO BE PAID ONE–HALF BY APPELLANTS AND ONE–HALF BY APPELLEES.**

MURPHY, Chief Justice, dissenting.

In this case, in my view, there is no question but that there had to have been absolute overwhelming mental anguish on the part of [the tort victim] between the moment that he saw the danger and the time that there actually was a crash.

With the above explanation, the able, experienced trial judge rejected appellant's contention that pre-impact fright damages are not recoverable under the facts of this case. The jury obviously agreed with that analysis. I also agree with

the trial judge, and therefore dissent from the majority's decision to reduce the judgment by the amount awarded for the decedent's pre-impact fright.

A survivor's action simply does not present the danger of a spurious claim. Proof that the victim's injuries were fatal more than satisfies the "objective manifestation" requirement for awards based on the victim's fright. Moreover, pre-impact fright damages are not recoverable in such cases unless there is circumstantial evidence that the decedent made a conscious effort to avoid the collision. In this case, the circumstantial evidence proved beyond any doubt that the decedent made such an effort.

Under the circumstances of this tragic case, the pre-impact fright claim was properly submitted to the jury, and the jury's verdict should not be disturbed. The pre-impact fright award is consistent with both Court of Appeals' precedent and the survivor's action provided for by a General Assembly that recognized the unfairness in allowing tortfeasors to benefit because the injuries they caused were fatal rather than serious.